# CENTRAL GREEN CO. *v.* UNITED STATES

No. 99–859.   Argued October 30, 2000—Decided February 21, 2001

STEVENS, J., delivered the opinion for a unanimous Court.

*Timothy Jones* argued the cause for petitioner. With him on the briefs were *Thomas C. Goldstein, W. Allen Bennett,* and *Erik S. Jaffe.*

*David C. Frederick* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Ogden, Deputy Solicitor General Underwood,* and *Irene M. Solet.**

JUSTICE STEVENS delivered the opinion of the Court.

Incident to the authorization of a massive flood control project for the Mississippi River in 1928, Congress enacted an immunity provision which stated that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 45

---

*\*M. Reed Hopper* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging reversal.

Stat. 535, as amended, 33 U. S. C. § 702c. At issue in this case is the meaning of the words "floods or flood waters." The narrow question presented is whether those words encompass all the water that flows through a federal facility that was designed and is operated, at least in part, for flood control purposes. The Ninth Circuit, relying upon a broader construction of § 702c than some other federal courts have adopted, concluded that they do. We granted certiorari to resolve the conflict, 529 U. S. 1017 (2000), and now reverse.

## I

Petitioner owns 1,000 acres of pistachio orchards in California's San Joaquin Valley. The Madera Canal, a federal facility that has been leased to the Madera Irrigation District (MID), flows through petitioner's property. In 1996, petitioner brought this action against respondent United States and the MID alleging that their negligence in the design, construction, and maintenance of the canal had caused subsurface flooding resulting in damage to the orchards and increased operating costs for petitioner. Petitioner did not allege that any physical failure of the dam caused the damage to its property. The complaint sought damages under the Federal Tort Claims Act, 28 U. S. C. § 2671 et seq., as well as injunctive relief. Relying on the immunity granted by the Flood Control Act of 1928, 33 U. S. C. § 702c, the United States moved for judgment on the pleadings.

Accepting petitioner's submission that the Madera Canal was used for irrigation purposes, the District Court nevertheless dismissed the complaint because the parties agreed that the canal was a part of the Friant Division of the Central Valley Project, and that flood control was one of the purposes of that project. The District Court's decision was dictated by an earlier Ninth Circuit case, which held that if a "'project has flood control as one of its purposes, and the

events giving rise to the action were not wholly unrelated to the project,'" immunity necessarily attached.[1]

On appeal, the Ninth Circuit affirmed. It agreed with petitioner that the Madera Canal "serves no flood control purpose," but nevertheless held that immunity attached "solely because it is a branch of the Central Valley Project." 177 F. 3d 834, 839 (1999). As the Ninth Circuit put it, "[a]lthough the water in the Madera Canal was not held for the purpose of flood control, because it was part of the Central Valley Project, it was *not wholly unrelated*' to flood control." *Ibid.* (emphasis added). In so holding, however, the court recognized that the Government would probably not have enjoyed immunity in at least three other Circuits where the courts require a nexus between flood control activities and the harm done to the plaintiff.[2] Noting the "harsh result of [the] decision," the Ninth Circuit frankly acknowledged that "[t]he 'not wholly unrelated' test applied by this and other circuits reads broadly an already broadly written grant of immunity." *Ibid.* As the Ninth Circuit recognized, under such a test, there would seem to be no "set of facts where the government is not immune from damage arising from water that at one time passed through part of the Central Valley or other flood control project." *Ibid.*

## II

Not until more than a half century after its enactment did this Court have occasion to interpret § 702c. In a consolidated case arising out of two separate accidents, we held that the section "bars recovery where the Federal Government

---

[1] App. to Pet. for Cert. 15 (quoting *Washington* v. *East Columbia Basin Irrigation Dist.*, 105 F. 3d 517, 520 (1997)).

[2] Citing *Fryman* v. *United States*, 901 F. 2d 79 (CA7 1990); *Boyd* v. *United States*, 881 F. 2d 895 (CA10 1989); and *Hayes* v. *United States*, 585 F. 2d 701 (CA4 1978), the Ninth Circuit specifically identified the Fourth, Seventh, and Tenth Circuits as ones which likely would have reached a different result.

would otherwise be liable under the Federal Tort Claims Act, 28 U. S. C. § 2671 *et seq.*, for personal injury caused by the Federal Government's negligent failure to warn of the dangers from the release of floodwaters from federal flood control projects." *United States* v. *James*, 478 U. S. 597, 599 (1986).

The principal issue in the *James* case was whether the statutory word "damage" encompassed not just property damage, but also personal injuries and death. In light of the legislative history, which it reviewed at some length, *id.*, at 606–609, 610–612, the Court concluded that the best reading of the statutory text was one which was both broader and less literal, and which encompassed the claims at issue in the two cases before the Court.

In both instances, the injuries were caused by the turbulent current generated by unwarned releases of waters from a reservoir after the Army Corps of Engineers had determined that the waters were at "flood stage." The fact that the injuries were caused by "flood waters" was undisputed.[3] In its opinion, the Court held that the language of the statute covered the two accidents because the "injuries occurred as a result of the release of waters from reservoirs that had reached flood stage." *Id.*, at 604.

Nevertheless, the Court's opinion in *James* included a passage that lends support to the Ninth Circuit's holding in this case. In that passage, the Court wrote:

---

[3] The first case arose out of an incident at the Millwood Dam in Arkansas, when "the level of the Reservoir was such that the United States Corps of Engineers designated it at 'flood stage.' As part of the flood control function of the Millwood facility, the Corps of Engineers began to release water through the tainter gates. This release created a swift, strong current toward the underwater discharge." 478 U. S., at 599. The second case arose as a result of a decision by the Corps of Engineers to release waters in the reservoir of Bayou Courtableau Basin which "were at flood stage." *Id.*, at 601. The District Court found that § 702c applied because the "'gates were opened to *prevent* flooding and inundation landside of the drainage structure.'" *Id.*, at 602 (emphasis added).

"Nor do the terms 'flood' and 'flood waters' create any uncertainty in the context of accidents such as the ones at issue in these cases. The Act concerns flood control projects designed to carry floodwaters. *It is thus clear from § 702c's plain language that the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control,* as well as to waters that such projects cannot control." *Id.,* at 605 (emphasis added).[4]

The sentence that we have italicized and, in particular, the phrase "related to flood control" have generated conflicting opinions among the Courts of Appeals. In an attempt to make sense of what is admittedly confusing dicta, some courts have focused on whether the damage relates in some, often tenuous, way to a flood control project, rather than whether it relates to "floods or flood waters."[5] However,

---

[4] The Court appended a footnote pointing out that the District Court in each case had found that the waters at issue had been "released from federal flood control facilities to prevent flooding" and that the Court of Appeals had upheld those findings "and assumed that 'the waters in this [consolidated] case were floodwaters.'" See *id.,* at 606, n. 7.

[5] See, *e. g., Washington* v. *East Columbia Basin Irrigation Dist.,* 105 F. 3d 517 (CA9 1997); *Williams* v. *United States,* 957 F. 2d 742 (CA10 1992); *Dawson* v. *United States,* 894 F. 2d 70 (CA3 1990); *DeWitt Bank & Trust Co.* v. *United States,* 878 F. 2d 246 (CA8 1989). This approach, however, can be overinclusive. As Judge Easterbrook has pointed out: "The 'management of a flood control project' includes building roads to reach the beaches and hiring staff to run the project. If the Corps of Engineers should allow a walrus-sized pothole to swallow tourists' cars on the way to the beach, or if a tree-trimmer's car should careen through some picnickers, these injuries would be 'associated with' flood control. They would occur within the boundaries of the project, and but for the effort to curtail flooding the injuries would not have happened. Yet they would have nothing to do with management of flood waters, and it is hard to conceive that they are 'damage from or by floods or flood waters' within the scope of § 702c.'" *Fryman* v. *United States,* 901 F. 2d, at 81. More

more than one court has pointed out that, if read literally, the sentence sweeps so broadly as to make little sense.[6] Moreover, the sentence was unquestionably dictum because it was not essential to our disposition of any of the issues contested in *James.*[7]   It is therefore appropriate to resort to the text of the statute, as illuminated by our holding in *James*, rather than to that isolated comment, to determine whether the water flowing through the Madera Canal that allegedly caused the damage to petitioner's pistachio orchards is covered by § 702c.   See *Humphrey's Executor* v. *United States*, 295 U. S. 602, 627 (1935) (dicta "may be followed if sufficiently persuasive" but are not binding).   See also *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18, 24 (1994).

In *James*, we held that the phrase "floods or flood waters" is not narrowly confined to those waters that a federal project is unable to control, and that it encompasses waters that are released for flood control purposes when reservoired waters are at flood stage.   That holding, however, is vastly different from the Ninth Circuit's reading of § 702c, under which immunity attaches simply because the Madera Canal is part of the Friant Division of the Central Valley Project, and flood control is one of the purposes served by that project.   The

---

to the point, such an approach is also inconsistent with the statutory language.   See *infra*, at 434.

[6] "Other circuits recognize that such a sweeping grant of immunity makes little sense in light of the text and purpose of the Act."   *Cantrell* v. *United States Dept. of Army Corps of Engineers*, 89 F. 3d 268, 271 (CA6 1996).   See also *Fryman*, 901 F. 2d, at 81 ("*James* was so broadly written that it cannot be applied literally").

[7] In addition to concluding that the word "damage" includes personal injury and death, the Court also rejected the previously arguable propositions that the Federal Government's subsequent waiver of sovereign immunity in the Federal Tort Claims Act had impliedly repealed § 702c; and that the immunity applied only to the flood control on the Mississippi River authorized by the 1928 Act.

holding in *James* also differs from the less attenuated and more fact-specific position advanced by the Government, which would require us to take judicial notice of evidence that the Friant Division of the Central Valley Project and, indeed, the Madera Canal itself can and do serve flood control purposes. We ultimately conclude that the judgment cannot be upheld under either rationale, but begin with a description of the Central Valley Project and an explanation of the factual basis for the Government's submission.

### III

We begin by observing that water can be either a liability or an asset. The Mississippi River flood of 1927 was unquestionably an example of the former. That flood in turn led to the enactment of the 1928 Flood Control Act. Similar, though less extreme, floods of the Sacramento and San Joaquin Rivers in California provided an important motivation for the authorization of the Central Valley Project. Although that project has not completely eliminated flooding on either river, it has succeeded in converting a huge liability into an immensely valuable asset. Justice Jackson described the magnitude of that transformation in his opinion for the Court in *United States v. Gerlach Live Stock Co.,* 339 U. S. 725 (1950):

> "This is a gigantic undertaking to redistribute the principal fresh-water resources of California. Central Valley is a vast basin, stretching over 400 miles on its polar axis and a hundred in width, in the heart of California. Bounded by the Sierra Nevada on the east and by coastal ranges on the west, it consists actually of two separate river valleys which merge in a single pass to the sea at the Golden Gate. Its rich acres, counted in the millions, are deficient in rainfall and must remain generally arid and unfruitful unless artificially watered.

"To . . . make water available where it would be of greatest service, the State of California proposed to re-engineer its natural water distribution. This project was taken over by the United States in 1935 and has since been a federal enterprise. The plan, in broad outline, is to capture and store waters of both rivers and many of their tributaries in their highland basins, in some cases taking advantage of the resulting head for generation of electric energy. . . . [T]he waters of the San Joaquin will be arrested at Friant, where they would take leave of the mountains, and will be diverted north and south through a system of canals and sold to irrigate more than a million acres of land, some as far as 160 miles away. A cost of refreshing this great expanse of semiarid land is that, except for occasional spills, only a dry river bed will cross the plain below the dam. Here, however, surplus waters from the north are utilized, for through a 150-mile canal Sacramento water is to be pumped to the cultivated lands formerly dependent on the San Joaquin." *Id.*, at 728–729.

"The Central Valley basin development envisions, in one sense, an integrated undertaking, but also an aggregate of many subsidiary projects, each of which is of first magnitude. It consists of thirty-eight major dams and reservoirs bordering the valley floor and scores of smaller ones in headwaters. It contemplates twenty-eight hydropower generating stations. It includes hundreds of miles of main canals, thousands of miles of laterals and drains, electric transmission and feeder lines and substations, and a vast network of structures for the control and use of water on two million acres of land already irrigated, three million acres of land to be newly irrigated, 360,000 acres in the delta needing protection from intrusions of salt water, and for municipal and miscellaneous purposes including cities, towns, duck clubs and game refuges. These projects are not only widely

separated geographically, many of them physically independent in operation, but they are authorized in separate acts from year to year and are to be constructed at different times over a considerable span of years." *Id.*, at 733.

Justice Jackson's description of the magnitude of the Central Valley Project makes one proposition perfectly clear: to characterize every drop of water that flows through that immense project as "flood water" simply because flood control is among the purposes served by the project unnecessarily dilutes the language of the statute. The text of the statute does not include the words "flood control project." Rather, it states that immunity attaches to "any damage from or by floods or flood waters . . . ." Accordingly, the text of the statute directs us to determine the scope of the immunity conferred, not by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage and the purposes behind their release.

## IV

The Government has asked us to take judicial notice of certain basic facts about the Friant Division of the Central Valley Project and about the waters flowing through that division and, more particularly, through the Madera Canal. Although petitioner will have an opportunity to challenge those details on remand, we accept them for purposes of this opinion.

The two major rivers supplying water to the Central Valley Project are the Sacramento in the north, and the San Joaquin in the south. From its headwaters in the Sierra Nevada Mountains, the San Joaquin flows in a southwesterly direction into a reservoir, known as Millerton Lake, just above the Friant Dam. The reservoir has a storage capacity of 520,500 acre-feet of water. In dry years, the total flow in the river does not produce that amount, but on average, the

annual flow apparently approximates 3½ times the reservoir's capacity. Water is released through outlets in the dam that send it down the San Joaquin River, and also through outlets that direct it into either the Madera Canal to the northwest, or the Friant-Kern Canal to the southeast. When the water level exceeds 578 feet, it flows over the dam's spillway into the San Joaquin. At that point, the river can accommodate a flow of 8,000 cubic feet per second without flooding. The Madera Canal can accommodate 1,200 cubic feet per second, and the Friant-Kern another 4,500 cubic feet per second. Thus, a total release of 13,700 cubic feet per second in three directions would not appear to include any "flood water."

The Madera Canal, which is about 40 miles in length, is used primarily for irrigation purposes. Water that enters the canal at the Friant Dam is purchased by farmers who either use it immediately or store it for future use. As a result, the amount of water that enters the canal is larger than the quantity that may flow into the Chowchilla River at its terminus.[8] Except in years of extreme drought, the Madera Irrigation District provides contracting farmers with "a dependable water supply" of approximately 138,000 acre-feet of "Class 1 water." In addition, "if, as, and when it can be made available," the District sells "Class 2 water" to the farmers at a price that is lower than the Class 1 price because of the "uncertainty as to availability and time of occurrence."[9] Thus, again in a literal sense, it seems clear that none of the Class 1 or Class 2 water sold by the District and purchased by the farmers to store or irrigate their lands includes any "flood water."

---

[8] The Chowchilla flows in a westerly direction into the San Joaquin, which in turn flows in a northwesterly direction at that point.

[9] In some exceptional circumstances, irrigation contractors may be obligated to buy Class 2 water at a particular time. However, contractors still pay for the water, regardless of the potential inconvenience with respect to the timing or date of delivery.

Water that is not purchased under either class simply flows through the canal into the Chowchilla River. As the Government points out, that excess may include flood water. However, given the fact that the canal can accommodate a flow of 1,200 cubic feet per second, which amounts to about 2,380 acre-feet per day, it is entirely possible that over the span of a year, several times the amount of Class 1 and Class 2 waters described in the papers submitted by the Government could flow through the canal without causing anything approaching a flood. Nevertheless, according to the Government, because the Madera Canal is available to divert water that might otherwise produce a flood on the San Joaquin and flood control is among the purposes served by the canal, § 702c immunity must attach to all the water that flows through the canal. Under the Government's approach, this would be true even if the water never approached flood stage and the terminus of the canal was parched at the end of the summer. Admittedly, it is possible to read the "related to" portion of the dictum from *James* to support that result, but neither the language of the statute itself, nor the holding in *James*, even arguably supports such a strange conclusion. Accordingly, we disavow that portion of *James*' dicta.

V

This case does raise a difficult issue because the property damage at issue was allegedly caused by continuous or repeated flows occurring over a period of years, rather than by a single, discrete incident. It is relatively easy to determine that a particular release of water that has reached flood stage is "flood water," as in *James*, or that a release directed by a power company for the commercial purpose of generating electricity is not, as in *Henderson* v. *United States*, 965 F. 2d 1488 (CA8 1992). It is, however, not such a simple matter when damage may have been caused over a period of time in part by flood waters and in part by the routine use of the canal when it contained little more than a trickle. The

fact that a serious flood did occur in the San Joaquin in 1997 creates the distinct possibility that flood waters may have surged down the Madera Canal and harmed petitioner's property.

For present purposes, we merely hold that it was error to grant the Government's motion for judgment on the pleadings and that it is the text of § 702c, as informed by our holding in *James*, rather than the broad dictum in that opinion, that governs the scope of the United States' immunity from liability for damage caused "by floods or flood waters." Accordingly, in determining whether § 702c immunity attaches, courts should consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*