**State of CALIFORNIA, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 01–5031.**

United States Court of Appeals, Federal Circuit.

Nov. 27, 2001.

Gordon B. Burns, Deputy Attorney General, Office of the Attorney General, Department of Justice, State of California, of Sacramento, California, argued for plaintiff-appellant. With him on the brief were Bill Lockyer, Attorney General,; Pamela Smith–Steward, Chief Assistant Attorney General; Margaret Rodda, Senior Assistant Attorney General; and Darryl L. Doke, Supervising Deputy Attorney General.

Gregory R. Firehock, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Stuart E. Schiffer, Acting Attorney General; David M. Cohen, Director; James M. Kinsella, Deputy Director; and Lisa B. Donis, Attorney.

Before MICHEL, Circuit Judge, ARCHER, Senior Circuit Judge, and RADER, Circuit Judge.

MICHEL, Circuit Judge.

Plaintiff–Appellant State of California appeals the judgment of the United States Court of Federal Claims holding that the Flood Control Act of 1928, codified at 33 U.S.C. § 702c (1994), immunizes the United States from breach-of-contract claims for damages arising from or related to flood control projects. Because we conclude that, to the extent sovereign immunity might otherwise apply, it has been waived by the previously-enacted Tucker Act, 28 U.S.C. § 1491 (1994), and the later

enactment did not repeal the earlier by implication, we reverse, ordering judgment for the State of California, and remand for an assessment of damages.

## BACKGROUND

In the mid–1950s, the State of California ("California") and the United States, through the Department of the Interior, independently evaluated the possibility of expanding their respective water projects in the Central Valley of California. Both ultimately determined that only one, and the same, location for their respective projects was feasible. As a result, the parties began discussing a joint project. In 1960, Congress authorized the Secretary of the Interior ("Secretary") to negotiate and enter into an agreement with California, subject to Congressional approval, for the construction of a joint-use facility. *See* Pub.L. No. 86–488, 74 Stat. 156 (1960) ("the San Luis Act"). The principal purpose of the San Luis Act was to furnish water for irrigation of approximately 500,000 acres of land in central California along the San Luis Unit, with contemplated incidental use for, among other things, recreational and fish and wildlife benefits. *Id.*

The Secretary exercised his congressionally granted authority on behalf of the United States, reaching an agreement with California in December 1961 ("the 1961 Contract"); the parties also entered into a Supplemental Agreement in 1972. The 1961 Contract provided that the United States would construct the joint-use facility and thereafter turn it over to California for operation and maintenance. Notably, it further provided that:

> The United States and the State shall each pay annually an equitable share of the operation, maintenance, and replace-ment costs of the joint-use facilities, including claims paid by either party. The method of computation of the share to be paid by each agency shall be mutually agreed to by the State and the United States before the transfer of care, operation, and maintenance of joint-use facilities.

Before California began operating the joint-use facility, the parties agreed that the costs would be equitably apportioned as follows: California would cover 55% of the costs identified in the blocked excerpt above, and the United States would cover the remaining 45%.

Under San Luis Act § 2, the 1961 Contract became effective after the contract had been before Congress for ninety days, and was not disapproved by either the House or the Senate Interior and Insular Affairs Committees. *See* 87 Cong. Rec. 12,435 (July 2, 1962) (statement of Sen. Miller). In 1967, the United States Bureau of Reclamation completed construction of the San Luis Unit, a 102 mile canal that transports water from Northern California through the Central Valley to Southern California. Importantly, the canal crosses the path of several transitory streams such that, in times of heavy rainfall, water from those streams is diverted onto neighboring landowners' property. As a result, between 1969 and 1993, the United States and California made payments totaling over $7 million, all related to damage from flood waters from such diversions. Each time, the parties paid their agreed-upon share of the claim— until March 1995.

In March 1995, a large storm caused a massive overflow of the transitory stream beds, causing property damage in excess of $5.3 million. Over the next four years, California paid many claims seeking com-

pensation for this damage. When it sought partial reimbursement, however, the United States asserted—for the very first time—that · it was not required to contribute its share because it was immune under the Flood Control Act of 1928, 33 U.S.C. § 702c.

California sued the United States for breach of contract in the Court of Federal Claims. The parties stipulated to the facts recounted above and cross-moved for summary judgment, agreeing that resolution of the suit turned on whether the cause of action was barred by the doctrine of sovereign immunity. Eschewing oral argument, the Court of Federal Claims granted the United States' motion, denied California's motion, and entered judgment for the United States. *California v. United States*, 47 Fed.Cl. 688 (2000). In reaching its decision, the court concluded that no liability could attach because the Flood Control Act covers all damage from floods and flood waters, and the San Luis Unit "was designed from its inception as a flood control project." *Id.* at 696. And it was persuaded that, in light of the broad, sweeping language of the Flood Control Act, the 1961 Contract and its 1972 Supplement were entered into *ultra vires*, such that the section of those contracts requiring the United States to partially reimburse California for claims paid for flood damage arising from floods or flood waters was of no force or effect. *Id.* at 698 ("Regardless of whether the 1961 Contract and the 1972 Supplement contemplated the sharing of cost of flood claims, this court cannot enforce terms, whether freely negotiated or not, which are in violation of a congressionally-enacted statute ... [T]he conduct of the parties [is irrelevant because] an agency cannot ratify an arrangement which violates federal law.").

Final Judgment was entered in favor of the United States on September 26, 2000,

after which California timely filed its Notice ·of Appeal. We heard oral argument on October 2, 2001. The appeal is now ripe for disposition.

## ANALYSIS

### I.

We review a grant of summary judgment *de novo,* employing an identical standard to that applied by the trial court. *Wolff Shoe Co. v. United States,* 141 F.3d 1116, 1121 (Fed.Cir.1998). The mere ·fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion; each must be independently assessed on its own merit. *Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1364 (Fed.Cir.2001). Accordingly, summary judgment is appropriate here if, drawing all inferences in a light most favorable to the non-movant, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II.

The Flood Control Act of 1928 enacted a "comprehensive ten-year program for the [Mississippi Valley], embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds." *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986) (quoting *United States v. Sponenbarger,* 308 U.S. 256, 262, 60 S.Ct. 225, 84 L.Ed. 230 (1939)). Now applicable nationwide, the Act contains an immunity provision covering "floods and flood waters," which is indeed broad in scope: "No liability of any kind

shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place...." 33 U.S.C. § 702c (1994). The present case is one of first impression insofar as no court appears to have addressed whether this immunity provision is waived when the United States enters into contracts that may be somehow related to flood control projects and those contracts create Tucker Act jurisdiction.

Historically, the issue of waiver has arisen most often in the context of suits sounding in tort—such as whether the United States can be held liable for negligent failure to warn recreational boaters before the Army Corps of Engineers releases flood waters from a federal flood control project, *United States v. James*, 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986), whether the United States can be held liable for injuries caused while the Coast Guard tows a stranded recreational vehicle on a flood control lake, *Boudreau v. United States*, 53 F.3d 81 (5th Cir.1995), or whether the United States can be held liable for damages from waters that spilled when a retaining wall for an irrigation channel burst, *Washington v. East Columbia Basin Irr. Dist.*, 105 F.3d 517 (9th Cir.1997). In each instance, the United States has enjoyed immunity as a result of the "undeniable" breadth of the scope of immunity under § 702c. *Boudreau*, 53 F.3d at 83; *see also James*, 478 U.S. at 604, 608, 106 S.Ct. 3116 ("It is difficult to imagine broader language.... Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from 'any' liability associated with flood control.").

The Court of Federal Claims found such cases, and *James* in particular, to be instructive in determining if the grant of immunity under § 702c extends to actions for breach of contract. Citing in *James* the discussion of the legislative history of the Flood Control Act, the court concluded that breach of contract claims are within the ambit of § 702c because the legislative history "show[s] that the sweeping language of § 702c was no drafting inadvertence." *State of California*, 47 Fed.Cl. at 696 (quoting *James*, 478 U.S. at 607–08, 106 S.Ct. 3116). On appeal, California asserts that this conclusion is logical only if the Flood Control Act effected a partial repeal of the Tucker Act, 28 U.S.C. § 1491, which California of course contends it did not. The Court of Federal Claims impliedly rejected this argument below by distinguishing the primary case upon which the argument was based. *See State of California*, 47 Fed.Cl. at 695. This was error; we agree with California.

### III.

#### A.

▪ The Tucker Act of 1887 grants the Court of Federal Claims jurisdiction over "[a]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (1994). It thus constitutes a waiver of sovereign immunity for those claims. *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed.Cir.2001). On its face, the Flood Control Act of 1928 prohibits any liability of any kind from attaching to or resting upon the United States for any damage from or by floods or flood waters. 33 U.S.C. § 702c. As to claims cognizable under the Tucker Act, these

two statutes are directly at odds with one another. This contradiction can be reconciled if the later-occurring statute, *i.e.*, the Flood Control Act of 1928, partially impliedly repealed the earlier-occurring statute, *i.e.*, the Tucker Act of 1887.

■ "It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." *Randall v. Loftsgaarden*, 478 U.S. 647, 661, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). For a more recent statute to impliedly repeal an existing one, it is insufficient to demonstrate "that the two statutes produce differing results when applied to the same factual situation." *United States v. Batchelder*, 442 U.S. 114, 122, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). To the contrary, "the legislative intent to repeal must be manifest in the 'positive repugnancy between the provisions'" of the two statutes. *United States v. Borden Co.*, 308 U.S. 188, 199, 60 S.Ct. 182, 84 L.Ed. 181 (1939). "Positive repugnancy" means that the two statutes are incapable of co-existence. *Cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("[W]here two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." (internal citations omitted)).

Both at the trial level and now on appeal, California has relied heavily upon *Ruckelshaus*, a case in which the Supreme Court held that the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") did not partially impliedly repeal the Tucker Act for constitutional takings claims. *See* 467 U.S. at 1018–19, 104 S.Ct. 2862.

The Court of Federal Claims found *Ruckelshaus* distinguishable on the theory that a claim based on the Constitution was somehow different from a breach-of-contract case, for Tucker Act purposes:

> This court possesses jurisdiction under the Tucker Act to adjudicate claims based upon a[sic] express contract. Unlike the present case, however, *Ruckelshaus* addressed a constitutionally derived right in a takings case, and not a contract case involving the issue of whether the government was authorized to enter into a contract for the indemnification of flood claims, as it did in the 1961 Contract and the 1972 Supplement.

*State of California*, 47 Fed.Cl. at 695.

■ We fail to see any validity in the distinction drawn by the Court of Federal Claims.[1] The Tucker Act grants jurisdiction to hear claims founded upon the Constitution *and* upon claims founded on express contracts. That the Tucker Act is merely jurisdictional is of no moment: "if a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). In other words, the waiver of immunity arises not from the Tucker Act itself, but from some substantive right guaranteed by or granted in the underlying document upon which jurisdiction is based—in *Ruckelshaus*, the Constitution; here, the 1961 Contract and the 1972 Supplement. *Accord Warr v. United States*, 46 Fed. Cl. 343, 346–47 (2000) ("The Tucker Act waives the sovereign immunity of the United States and grants the Court of Federal Claims jurisdiction

---

1. Ironically, both before and after the March 1995 flood, the United States appears to have settled at least two inverse condemnation cases brought under 28 U.S.C. § 1491 by landowners who alleged that the regular flooding of their property by the operation of the San Luis Unit constituted a taking under the U.S. Constitution.

over a claim *where a substantive right exists elsewhere, such as in a contract* or 'money-mandating' statute or regulation.") (emphasis added). The alleged distinction in *Ruckelshaus* simply does not withstand scrutiny.

■ Of course, this case would be quite different had there been some unambiguous evidence in the text or legislative history of § 702c that Congress had "withdrawn the Tucker Act grant of jurisdiction," *Ruckelshaus,* 467 U.S. at 1017, 104 S.Ct. 2862, but no such evidence exists. Certainly, as recounted in *James* (and reiterated in the opinion below), there was strong language from numerous representatives indicating that the immunity provision was intended to be broad, in order to protect the public fisc. *See* 478 U.S. at 606–08, 106 S.Ct. 3116. That is an insufficient basis, however, upon which to presume an implied partial repeal of the Tucker Act. *Preseault v. Interstate Commerce Comm'n,* 494 U.S. 1, 14, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) ("There is no doubt that Congress meant to keep [costs] to a minimum. This intent, however, has little bearing on the Tucker Act question [because we] have previously rejected the argument that a generalized desire to protect the public fisc is sufficient to withdraw relief under the Tucker Act.") (citing *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)). Moreover, the Tucker Act, of which Congress was surely aware because it predated the Flood Control Act by over 40 years, is not mentioned in the statute and does not appear in the legislative history to have been discussed at all. *Cf. Ruckelshaus,* 467 U.S. at 1017, 104 S.Ct. 2862 ("Nowhere in FIFRA or in its legislative history is there discussion of the interac-

tion between FIFRA and the Tucker Act ... [W]e would [therefore] have to infer a withdrawal of jurisdiction with respect to takings under FIFRA from the structure of the statute or from its legislative history.").

■ It may be that Congress did not contemplate a breach-of-contract claim arising from or related to "flood or flood waters." Or it may be that Congress intended to expressly partially repeal the Tucker Act, but somehow failed to do so. Whatever the case, our task in construing a statute is limited to a review of what Congress did, and not what it later thought it did or what in hindsight it ought to have done. Our review of the Flood Control Act of 1928 leaves us with the firm conviction that Congress did not partially impliedly repeal the Tucker Act.

### B.

Despite reaching the conclusion that the Flood Control Act of 1928 immunized the United States from suit—seemingly an adequate ground upon which to grant judgment to the United States—the Court of Federal Claims went further to hold that, in any event, the United States was without authority to contract to indemnify the State for flood claim payments. *State of California,* 47 Fed. Cl. at 697. This, too, was error.

■ Without a doubt, contractual provisions made in contravention of a statute are void and unenforceable, and an agent acting *ultra vires* cannot bind the federal government. *See, e.g., Fed. Crop Ins. Co. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). But the present case is hardly one where, for example, a federal agent without authority promises a

reward to an informant, *see Allen v. United States*, 229 Ct.Cl. 515 (1981), or a federal land bank exceeds its scope of statutory authority by honoring a letter of credit, *see REW Enters., Inc. v. Premier Bank, N.A.*, 49 F.3d 163 (5th Cir.1995). Here, Congress passed a public law expressly authorizing the Secretary of the Interior, "on behalf of the United States, to negotiate and enter into an agreement with the State of California providing for coordinated operation of the San Luis Unit...." San Luis Act § 2. The Secretary's authority was not limited to building the canal, but in appropriate circumstances, could include operating it. No funds were appropriated to commence construction under the terms of the agreement until the agreement had been "submitted to Congress, and then only if neither the House nor the Senate Interior and Insular Affairs Committee [disapproved] it by committee resolution within ninety days." *Id.* The agreement took effect after it was not disapproved. *See* 87 Cong. Rec. 12,435 (July 2, 1962) (statement of Sen. Miller). We find it implausible, in light of these circumstances, to conclude that the Secretary of the Interior acted *ultra vires* by entering into the 1961 Contract and 1972 Supplemental Agreement.[2]

## IV.

Finally, we note in passing that prudence would have impelled us to vacate and remand this case for reconsideration in light of *Central Green Co. v. United States*, 531 U.S. 425, 121 S.Ct. 1005, 148 L.Ed.2d 919 (2001), even if we did not conclude that the Tucker Act issue was dispositive. The *Central Green* opinion is-

sued during the briefing period in this case, in February 2001. Neither party requested supplemental briefing nor otherwise brought the case to the attention of this court. We therefore requested that the parties be prepared to address at oral argument the impact, if any, of *Central Green* on this case; both minimized its importance before the panel, apparently believing it relatively immaterial to the present appeal. In light of the Court of Federal Claims' reliance on *United States v. James*, however, we look askance at that assessment. *Central Green* clarifies the holding of *James*.

The question addressed by the Supreme Court in *Central Green* was whether the words "flood or flood waters" in 33 U.S.C. § 702c "encompass all water that flows through a federal facility that was designed and is operated, at least in part, for flood control purposes." 121 S.Ct. at 1007. The petitioner there owned 1,000 acres of pistachio orchards that had been flooded by waters from the Madera Canal, a federal facility maintained primarily for irrigation purposes. *Id.* Both the district court and the court of appeals held that the United States was immune from suit, notwithstanding the fact that the true purpose of the facility that caused the damage was irrigation, solely because the Madera Canal was part of the Central Valley Project, and therefore tenuously related to flood control. *Id.* The Supreme Court reversed, disavowing the "admittedly confusing dicta" in *James* defining the phrase "flood and flood waters" in § 702c as "all waters contained in or carried through a federal flood control project for purposes of or related to flood control." *Id.* 121 S.Ct. at

**2.** It is unclear from the record whether the 1972 Supplemental Agreement was ever subject to congressional approval. But, the sec-

tion of the 1961 Contract relevant to this appeal, *i.e.*, the cost-sharing provision, was unchanged by the 1972 Supplement.

1008–09, 1011–12 (citing *James,* 478 U.S. at 605, 106 S.Ct. 3116). Rather, it held that the inquiry is properly focused on the "character of the waters that cause the relevant damage and the purposes behind their release," not whether a nexus exists between the relevant damage and a flood control project. *Id.* 121 S.Ct. at 1011.

To be sure, the Court of Federal Claims did not have the benefit of the Supreme Court's ruling in *Central Green* when it rendered judgment in this case. Nevertheless, the holding of *Central Green* squarely calls into question the grounds upon which the Court of Federal Claims ruled. *See State of California,* 47 Fed.Cl. at 696 ("[T]he court concludes that under the Flood Control Act, no liability was intended to lie against the United States due to floods or flood waters so long as the action derives from a flood control project. The San Luis Unit was designed from its inception as a flood control project."). In view of our holding that the United States has waived sovereign immunity in this case, however, one is left only to speculate whether the character of the waters that caused the relevant damage here in fact would, under *Central Green,* vest the federal government with immunity under the Flood Control Act—on remand, the Court of Federal Claims has no occasion to address the issue.

## CONCLUSION

In the Joint Statement of Facts presented to the Court of Federal Claims, the United States indicated that if the court "were to find that immunity does not extend to flood claims presented pursuant to the 1961 Contract and Supplement, the United States' share of unpaid claims and related costs is approximately $2,806,000, not including costs that the State continues to incur from claims not yet resolved." In light thereof, and in consideration of the foregoing analysis, we reverse the grant of summary judgment as to the United States, reverse the denial of summary judgment as to the State of California, and remand the case for an appropriate calculation of damages.

*REVERSED AND REMANDED.*

## COSTS

Each party shall bear its own costs.