# United States Court of Appeals for the Federal Circuit

---

**CARDIOSOM, L.L.C.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-5109

---

Appeal from the United States Court of Federal Claims in case no. 08-CV-533, Judge Lawrence M. Baskir.

---

Decided: August 31, 2011

---

JERRY STOUCK, Greenberg Traurig, LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were GREGORY J. MORICAL, Dormir, Inc., of Carmel, Indiana, and ELENA B. GOBEYN, of Zionsville, Indiana.

ANUJ VOHRA, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and MARK A. MELNICK, Assistant Director.

---

Before LINN, PLAGER, and DYK, *Circuit Judges.*

PLAGER, *Circuit Judge.*

This case calls on us to determine whether, as Plaintiff-Appellant argues, the United States Court of Federal Claims ("Court of Federal Claims") has subject matter jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), over a breach of contract claim, when a statute related to the claim was read by that court to bar judicial review.

Congress, in 2008, enacted a revision to part of the Medicare statutes, known as the Medicare Improvements for Patients and Providers Act of 2008, Pub. L. 110-275, codified at 42 U.S.C. § 1395w-3 (the "2008 Amendment"). The 2008 Amendment unilaterally terminated a number of medical equipment and supplies contracts that had been made previously with individual providers by the United States (the "Government") under an earlier version of the statutes. The same amendment purported to deny "an independent cause of action or right to administrative or judicial review with regard to the termination[s] . . . ." 42 U.S.C. § 1395w-3(a)(1)(D)(i). Plaintiff, whose contracts were terminated as a consequence of the 2008 Amendment, sued the Government in the Court of Federal Claims on the grounds that the termination unlawfully breached its contract, entitling plaintiff to damages for the breach. The Court of Federal Claims, at the behest of the Government, dismissed the suit, holding that Congress in the above-noted language had effectively withdrawn the court's subject matter jurisdiction over such a claim. *Cardiosom v. United States*, 91 Fed. Cl. 659, 662-63 (2010).

For the reasons we shall explain, we hold that the 2008 Amendment did not withdraw traditional contract jurisdiction under the Tucker Act; plaintiff states a claim over which the Court of Federal Claims has jurisdiction. The judgment of the Court of Federal Claims is reversed, and the matter is remanded for further proceedings consistent with this opinion.

BACKGROUND

Title XVIII of the Social Security Act, commonly known as Medicare, establishes a federally funded health insurance program for the elderly and disabled. 42 U.S.C. § 1395. The Medicare program is divided into Part A, which provides insurance coverage for inpatient hospital treatment and related post-hospital expenses, and Part B, which is a voluntary program that provides beneficiaries with supplemental medical insurance benefits. In December 2003, Congress modified Medicare Part B through the Medicare and Prescription Drug, Improvement, and Modernization Act of 2003 ("2003 MMA"), Pub. L. No. 108-173. The 2003 MMA, in part, created a competitive acquisition program ("CAP") for items such as durable medical equipment and medical supplies. *See* 42 U.S.C. § 1395w-3(a)(2).

Plaintiff Cardiosom, L.L.C. ("Cardiosom") supplies oxygen and respiratory equipment and supplies for the treatment of sleep disorders. In July 2007, Cardiosom submitted a bid for the first round of the CAP to supply its equipment and supplies in nine of the ten areas designated by the Government. Cardiosom won its bid in all nine designated areas and was awarded a supplier contract for a three-year term beginning on July 1, 2008. *Cardiosom*, 91 Fed. Cl. at 661. Congress, however, modified the acquisition program by enacting the 2008 Amendment on July 15, 2008. The 2008 Amendment terminated all existing contracts, including Cardiosom's, which were in effect prior to the date of the enactment. *See* 42 U.S.C. § 1395w-3(a)(1)(D)(i)(I).

In a letter dated July 21, 2008, the Government notified Cardiosom that its contract was terminated effective June 30, 2008. Cardiosom promptly filed a complaint in the Court of Federal Claims alleging that the contract termination resulted in a breach of contract, or alternatively, that it resulted in an uncompensated taking of

property prohibited by the Fifth Amendment. *Cardiosom*, 91 Fed. Cl. at 661-62. The trial court dismissed the complaint for lack of subject matter jurisdiction, relying upon the last sentence in 42 U.S.C. § 1395w-3(a)(1)(D)(i), which states that "[n]othing in subclause (I) [the clause stating that the contracts were terminated] shall be construed to provide an independent cause of action or right to administrative or judicial review with regard to the termination provided under such subclause." *Id.* The trial judge concluded that the plain words of the statute "prohibit contractors from bringing any suit arising from the contract termination, such as claims for damages resulting from the termination." *Id.* at 662.

Cardiosom timely appealed the decision of the Court of Federal Claims; we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

1.

The Tucker Act, 28 U.S.C. § 1491, provides the Court of Federal Claims with subject matter jurisdiction over a large body of causes that can be brought against the Government, and provides a comparably broad waiver of that remnant of unlimited privilege the English Kings exercised over subjects known as "sovereign immunity." *United States v. Mitchell*, 463 U.S. 206, 217-19 (1983). Included in the jurisdictional grant and waiver under the Tucker Act are claims for breach of contract, such as the one at issue in this case.

Sovereign immunity was thought to be a part of the common law that was incorporated into the United States when we became a nation, though the respect given that doctrine, a continuing source of dispute and litigation, has varied with time and circumstance. *See* Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity,*

*and Judicial Independence*, 35 Geo. Wash. Int'l L. Rev. 521 (2003). With regard to Congress's withholding subject matter jurisdiction from a court that already has had it established, our law is clear—such a re-invocation of sovereign immunity by Congress must be done unambiguously. *Presault v. Interstate Commerce Comm'n*, 494 U.S. 1, 12 (1990) ("The proper inquiry is not whether the statute expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy, but rather whether Congress has in the statute withdrawn the Tucker Act grant of jurisdiction to the Claims Court to hear a suit involving the statute.") (internal citations omitted); *Slattery v. United States*, 635 F.3d 1298, 1301 (Fed. Cir. 2011) (en banc) ("[A] claim that is within the subject matter of the Tucker Act is not excluded from the jurisdiction of the Court of Federal Claims, or jurisdiction of the district courts under the 'Little' Tucker Act, unless such jurisdiction has been unambiguously withdrawn or withheld by a statute specifying such exclusion.").

When in 2003 Congress enacted the 2003 MMA, it included an explicit provision prohibiting the administrative or judicial review of specified steps and procedures in the competitive acquisition process:

> There shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise, of—
>
> (A) the establishment of payment amounts under paragraph (5);
>
> (B) the awarding of contracts under this section;
>
> (C) the designation of competitive acquisition areas under subsection (a)(1)(A) of this section and the identification of areas under subsection (a)(1)(D)(iii) of this section; . . .

(E) the selection of items and services for competitive acquisition under subsection (a)(2) of this section;

(F) the bidding structure and number of contractors selected under this section . . . .

42 U.S.C. § 1395w-3(b)(11).

Congress clearly intended that Medicare could proceed with these initial administrative processes without risk of litigation blocking the execution of the program. When Congress clearly expresses its intent, as it did here, courts honor Congress's wishes. *See, e.g.*, *Painter v. Shalala*, 97 F.3d 1351, 1356 (10th Cir. 1996) (finding that the district court did not have jurisdiction when Congress clearly indicated its intent to preclude administrative and judicial review of the conversion factors specified for Medicare Part B claims); *All Fla. Network Corp. v. United States*, 82 Fed. Cl. 468, 474 (2008) (concluding that the Medicare statute specifically precluded judicial review of the eligibility determinations and qualifying mechanisms used by the Government to award competitive acquisition contracts); *Carolina Med. Sales, Inc. v. Leavitt*, 559 F. Supp. 2d 69, 78-79 (D.D.C. 2008) (granting the Government's motion to dismiss because the decision to include mail-order diabetic supplies constituted a selection of items and services for which judicial review is not available).

The purpose of withholding judicial review in these instances is to insulate these management decisions by the Medicare Administration from the potential of inordinate delays that would transpire if every such management decision were open to an upfront challenge by some disappointed group. If there were to be legal challenges, they would have to be made after the fact. *See, e.g.*, H.R. Rep. No. 108-391, at 576-77 (2003) (Conf. Rep.) (explaining that the CAP in the 2003 MMA provides for flexibility

on the part of the Department of Health and Human Services Secretary (the "Secretary") "to waive certain provisions of the Federal Acquisition Regulation that are necessary for the efficient implementation of this program" and that such decisions are not subject to administrative or judicial review).

2.

In the case before us, Congress wanted to change the way the Secretary awarded these supply and service contracts. Congress could have simply mandated a new way for awarding future contracts, leaving the old ones to play out in the normal course. Instead, Congress chose to order a blanket termination of the existing contracts so that they could be replaced with an entirely new set of contractual arrangements. To accomplish this, Congress provided:

(I)     the contracts awarded under this section before July 15, 2008, are terminated, no payment shall be made under this subchapter on or after July 15, 2008, based on such a contract, and, to the extent that any damages may be applicable as a result of the termination of such contracts, such damages shall be payable from the Federal Supplementary Medical Insurance Trust Fund under section 1395t of this title;

(II)    the Secretary shall conduct the competition for such round in a manner so that it occurs in 2009 with respect to the same items and services and the same areas, except as provided in subclauses (III) and (IV);

(III)    the Secretary shall exclude Puerto Rico so that such round of competition covers 9, instead of 10, of the largest metropolitan statistical areas; and

(IV)    there shall be excluded negative pressure wound therapy items and services.

Nothing in subclause (I) shall be construed to provide an independent cause of action or right to administrative or judicial review with regard to the termination provided under such subclause.

42 U.S.C. § 1395w-3(a)(1)(D)(i)(I-IV).

There are several things to be noted about this provision. In subclause (I) Congress recognized that its action terminating the existing contracts might well have adverse consequences in terms of damages for breach. Perhaps remembering its experience with the Savings and Loan imbroglio, *see United States v. Winstar Corp.*, 518 U.S. 839 (1996), the termination provision was accompanied by an express recognition that payment of damages might be needed. A particular fund from which such damages were to be paid was specified. Presumably concerned about the inevitability of lawsuits of one kind or another, Congress also specified that there shall be no "independent cause of action or right to administrative or judicial review with regard to the termination" provided under that subclause. 42 U.S.C. § 1395w-3(a)(1)(D)(i).

The phrasing of this particular withholding provision—barring review of an "independent cause of action"—is a phrase most curious. Independent of what? There appears to be no exact counterpart in other Medicare withholding provisions. When asked at oral argument, Government counsel acknowledged that he knew of no other jurisdictional withholding provision quite like that. Oral Argument (May 5, 2011) at 14:53-16:24, *avail-*

*able     at*     http://www.cafc.uscourts.gov/oral-argument-recordings/2010-5109/all. Moreover, nothing in the legislative history, such as it is, casts light on the possible meanings of the phrase.

Cardiosom, combining the peculiarity of the language with the requirement that a withholding provision, in order to be effective, must be unambiguous, argues that that principle alone is sufficient to defeat the Government's position that his client is without a judicial remedy. Absent an unambiguous withdrawal of jurisdiction, argues Cardiosom, the Tucker Act forum remains available.

The Government response is to repeat its basic position that the provision is clear, needs no interpretation, and unambiguously withdraws jurisdiction over these damage claims. Given the phraseology in question, we find that unpersuasive. Indeed, when pressed, Government counsel conceded at argument that the language of "independent cause of action" was a bit odd. *Id.* at 20:38-20:55. Neither Cardiosom's negative conclusion that this provision has no understandable meaning, nor the Government's recitation that this facially ambiguous provision is clear on its face, carries the day. With only a little effort, the court can identify several alternative interpretations for this phraseology in the particular context of the 2008 Amendment, any one of which would be consistent with Congress's apparent purpose.

3.

First, there is a straightforward reading of the provision. Paragraph (I) of the provision recognizes that damages may need to be paid as a result of the contract breaches caused by the unilateral terminations, and authorizes payment from a specific insurance trust fund—the Federal Supplementary Medical Insurance Trust Fund, a part of the Centers for Medicare & Medicaid

Services ("CMS")—from which money judgments resulting from the contract terminations may be paid. 42 U.S.C. § 1395w-3(a)(1)(D)(i)(I). Ordinarily, when damage awards are made against the Government for breach of contract, say by the Court of Federal Claims, they are paid out of a general Judgment Fund. *See* 31 U.S.C. § 1304, 28 U.S.C. § 2517; *see also, e.g.*, *Lee by Lee v. United States*, 124 F.3d 1291, 1295 (Fed. Cir. 1997) (finding that a reimbursement provision within the Military Child Care Act of 1989 required that damages resulting from a breach of contract claim be paid from appropriated funds of the Department of Defense rather than the Judgment Fund).

This suggests that the Secretary might establish, within the Medicare program, some sort of administrative forum charged with paying reasonable compensation from that fund to the parties whose contracts were unilaterally terminated. Consistent with this interpretation, Congress could have intended that the statute not be read to provide an "independent cause of action or right to administrative or judicial review with regard to the termination," with respect to the structure of the administrative compensation mechanism established by the Secretary, or perhaps even to the rewards from the special fund created by the statute.

In fact, the Secretary has created just such an administrative mechanism. Under the authority of the 2008 Amendment, the Secretary, by regulation, established a process for compensating contractors whose contracts were terminated by the Act. *See* 42 C.F.R. § 414.425. Under this process, any aggrieved supplier that believes it has been damaged by the termination of its competitive bid contract may file a claim. *Id.* at § (a)(1). Claims must be filed within 90 days of January 1, 2010. The regulation specifies in detail the types of injuries that are compensable, and those that are non-compensable. For example, damages documented through receipts are

compensable but any profits the supplier may have expected from the contract are not. *Id.* at §§ (c)(3)(i), (d)(6).

The claims are reviewed by the Center for Medicare & Medicaid Services Competitive Bidding Implementation Contractor ("CBIC"), who makes a recommendation to the Center, which is designated as the "Determining Authority." *Id.* at § (f)(1)-(2). The Determining Authority is supposed to make a determination within 120 days of receipt of the claim by the CBIC, subject to limited exceptions for applicant delays, complexity, or large workload. *Id.* at § (g). The Determining Authority's determination "is final and not subject to administrative or judicial review." *Id.* at § (f)(2)(vi).

Shortly after the Court of Federal Claims dismissed its complaint, Cardiosom, on March 29, 2010, submitted a claim to the CBIC pursuant to the regulation. At the time of oral argument before this court (May 5, 2011) Cardiosom was still awaiting a response from CMS on its claim.

Both the 2008 Amendment that authorized payment of damages resulting from the contract terminations, and the administrative process established specifically for the purpose of paying such damages, *see* 74 Fed. Reg. 33,644 (July 13, 2009), leave a number of questions unanswered. In particular, there are questions with regard to the interaction of this administrative process with the established judicial process for resolving Government contract disputes under the Tucker Act.

It is without question that an aggrieved supplier cannot obtain a double recovery, that is, be compensated twice, once by the administrative process and once by a court, for the same injuries resulting from the termination of its contract. Less clear is whether an aggrieved supplier who obtains only a partial recovery of damages through the administrative process—i.e., for those elements of damage recoverable through that process—could

thereafter maintain a court suit for other damage elements, such as loss of profits (assuming the terms of the original contract do not preclude such additional elements of damage). Even less clear is whether there is any obligation on the part of the aggrieved supplier to exhaust its administrative remedies by first filing its claim under the administrative process before exercising its right to a suit in the Court of Federal Claims.

It is tempting to explore these unanswered questions, both because they are interesting and because the parties and the trial court might benefit from early answers. But, that is a temptation to be resisted. None are questions directly raised in this appeal, and the parties have not briefed or argued them. We thus leave to the trial court in the first instance the responsibility to address such questions if, on the remand, any of them become relevant and are brought properly before the court.

A second, somewhat different but equally plausible, interpretation of the judicial review withholding provision is that there is to be no independent judicial review of Congress's *decision to terminate* the existing contracts. That is, no challenge with regard to whether a particular contract was terminated *nunc pro tunc* is to be heard, either in administrative or judicial proceedings. Congress has chosen the unilateral termination route, and the contracts are to be taken conclusively as terminated. Absent some Constitutional transgression, Congress has invoked its sovereign right to make its termination decision final and unreviewable.

A third possible reading of the statutory language is that it is intended to prevent judicial or administrative review by third parties. That is, "independent" in the statute could be interpreted to mean "independent of the contracting parties," precluding litigation over collateral damages arising out of the terminations. And of course the Government's reading—that the statute is unambigu-

ous—is yet another reading, though we find it unconvincing and inconsistent with the obvious ambiguity of the clause.

4.

As noted above, the Tucker Act broadly waives the government's sovereign immunity for claims asserting breach of contract. 28 U.S.C. § 1491; *United States v. Mitchell*, 463 U.S. 206, 216 (1983) ("[I]f a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit."). For a statute to reinstate the government's sovereign immunity, Congress must manifest an "unambiguous intention to withdraw the Tucker Act remedy." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 968, 1019 (1984); *Slattery*, 635 F.3d at 1301. To do so, "the legislative intent to repeal must be manifest in the positive repugnancy between the provisions" of the statute and the Tucker Act. *California v. United States*, 271 F.3d 1377, 1382 (Fed. Cir. 2001) (citing *United States v. Borden Co.*, 308 U.S. 188, 199 (1939)). "Positive repugnancy means that the statute [is] incapable of co-existence" with the Tucker Act. *Id.* (citing *Ruckelshaus*, 467 U.S. at 1018).

In *California v. United States*, 271 F.3d 1377, we addressed whether the Flood Control Act of 1928 repealed the Tucker Act's waiver of sovereign immunity for breach of contract claims. The immunity provision there stated: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." *Id.* at 1380-81 (citing 33 U.S.C. § 702c (1994)). We held that this "broad" immunity provision did not manifest an unambiguous intent to withdraw the Tucker Act's waiver of sovereign immunity. *Id.* at 1380, 1388. We noted that the Flood Control Act failed to mention the Tucker Act, "of which Congress was surely aware," and that even if "Congress intended to expressly partially repeal the Tucker Act, but somehow

failed to do so, . . . our task in construing a statute is limited to a review of what Congress did, and not what it later thought it did or what in hindsight it ought to have done." *Id.* at 1383.

This case is even more compelling than *California v. United States* because the immunity provision here is not nearly as broad. Moreover, all the reasonable interpretations of the immunity provision discussed above are wholly capable of co-existence with the Tucker Act, in that they maintain a role for the Tucker Act (i.e., the allowance of breach of contract claims by contractors resulting from the terminations compelled by the Act), and a role for the immunity provision (i.e., as preventing judicial or administrative review of the compensation mechanism established by the secretary, or as to whether the contracts were properly terminated *nunc pro tunc*). The existence of reasonable interpretations that are consistent with the Tucker Act's waiver of sovereign immunity compel a finding that the 2008 Amendment did not manifest the necessary "unambiguous intention to withdraw the Tucker Act remedy." *Ruckelshaus*, 467 U.S. at 1019.

As we read it, the 2008 Amendment left open the question of the consequences of Congress's chosen route, and any private remedies arising therefrom. More specifically, the amendment left untrammeled the subject matter jurisdiction of the Court of Federal Claims to hear and decide breach of contract claims resulting from these terminations. Whatever may be the rule regarding non-reviewability of the act of termination, or the absence of challenge to the administrative remedy authorized, the legal consequences of the terminations can still be determined under existing federal law governing contract disputes with the Government

For purposes of deciding the jurisdictional question, given our reading of the 2008 Amendment, we need not

here address any Constitutional questions that might
arise when there is legislative intervention into estab-
lished contract rights. *See, e.g., Winstar*, 518 U.S. at 897
(specifying that the Government cannot repudiate its
contracts through its exercise of sovereign capacity when
the regulatory and contractual characteristics of the
Government are fused together). Our reading of the
statute has the further virtue of being consistent with
Congress's pattern of preventing administrative decision
making in the Medicare program from being hindered at
the inception by the potential delays of multiple litiga-
tions. *See, e.g. Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C.
Cir. 2004); *Am. Soc. of Cataract and Refractive Surgery v.
Thompson*, 279 F.3d 447 (7th Cir. 2002); *Carolina Med.
Sales, Inc. v. Leavitt*, 559 F. Supp. 2d at 69; *All Fla.
Network, Corp. v. United States*, 82 Fed. Cl. at 468. The
statute in effect clears away the prior administrative
actions in awarding contracts under the old law and
leaves the Secretary free to undertake further adminis-
trative contract actions without the hinderance of the
prior arrangements, but leaves unaffected the rights and
remedies created by the Government's prior contractual
obligations.

In summary, the Government's attempt to use this
provision to totally block judicial review of plaintiff's
breach of contract claim is inconsistent with our estab-
lished law, and contrary to the apparent purpose of Con-
gress in enacting such a provision. Absent the clear and
unequivocal language necessary to establish Congres-
sional intention to withdraw jurisdiction from the Court
of Federal Claims, we cannot find that the statute is
effective to withdraw jurisdiction over the contract dis-
pute alleged here. Plaintiff is entitled under the Tucker
Act to its day in court.

CONCLUSION

The judgment of the Court of Federal Claims that the court lacks subject matter jurisdiction over this contract claim is reversed, and the matter is remanded for further proceedings consistent with this opinion.  For the same reasons, the Court of Federal Claims' Tucker Act subject matter jurisdiction over plaintiff's Fifth Amendment takings claim is also unaffected by the 2008 Amendment; the court's judgment in that regard is also reversed. Depending on the outcome of the contract dispute, it may or may not be necessary for the court to reach the takings claim.  We leave to the sound discretion of the trial court when, if at all, it will be appropriate to do so.[1]

**REVERSED AND REMANDED**

---

[1]    At this stage of the proceedings we offer no opinion on what, if any, merits defenses the Government may have available to either the contract or takings claims.