[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 9, 2005
THOMAS K. KAHN
CLERK

_____

No. 02-16424

_____

D. C. Docket No. 01-00009-CV-JTC-3

PETER EVANS, DETREE JORDAN,

Plaintiffs-Appellees,

versus

DENIS STEPHENS,

Defendant- Appellant,

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(May 9, 2005)**

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON and PRYOR, Circuit Judges.

EDMONDSON, Chief Judge:

This case is about an arresting officer's investigatory strip search for the purpose of discovering drugs on persons who had been arrested lawfully but had been arrested for offenses that were not drug crimes.

Plaintiffs-Appellees, Peter Evans and Detree Jordan, sued Defendant-

Appellant, Police Officer Denis Stephens, alleging that Officer Stephens violated their rights under the Fourth Amendment to the United States Constitution. In ruling on defendants' motion for summary judgment, the district court concluded Officer Stephens's acts were unconstitutional and not protected by qualified immunity. A panel of this Court reversed the district court's decision on qualified immunity. We decided to vacate the panel's decision and to rehear the appeal. Assuming Plaintiffs' version of the facts is accurate, we now conclude that the pertinent conduct violated Plaintiffs' constitutional rights and that qualified immunity applies to just one alleged violation.

## *BACKGROUND*

For this appeal, these alleged and evidenced facts will be supposed to be the true facts.

Plaintiffs are two black males. The events giving rise to this appeal occurred on 22 January 1999; Plaintiffs were then in their early and middle twenties. That night, Evans and Jordan were traveling from Atlanta, Georgia, to Statesboro, Georgia, where both were or had been enrolled at Georgia Southern University. Evans drove himself and Jordan in a rental car. Despite that Evans had made the journey between Atlanta and Statesboro on many earlier occasions, they became lost and traveled down Interstate 85 instead of Interstate 75.

While trying to return to Interstate 75, Evans and Jordan passed through the City of Zebulon, Georgia. There, Officer Stephens, a white male, stopped Evans after Stephens clocked Evans's car traveling at a speed of seventy-two miles per hour in a

2

forty-five mile per hour zone.[1]  A video camera in Stephens's patrol car recorded the stop.  As Stephens approached Evans, another police officer from the City of Concord Police Department arrived on the scene.  Stephens suspected Evans might have been driving under the influence, but Evans denied doing so.  Stephens then ordered Evans out of the car and searched Evans's pockets.  Stephens claims he found a beer bottle top in one of Evans's pockets.  Evans denies the top was there, and Stephens did not show the bottle top to the recording camera.

Evans stayed at the rear of the rental car when Officer Stephens approached Jordan, who remained seated in the passenger seat.  Stephens took Jordan's drivers license and asked him to exit the car as well.  With Evans's permission, Stephens searched the car for about five minutes.  Stephens claims he saw an open container of an alcoholic beverage in the car.  Evans denies it, and Stephens did not follow his usual practice of showing the container to the recording camera.[2]

Officer Stephens cited Evans for speeding and read him the Georgia Implied Consent Law, O.C.G.A. § 40-6-392(a)(4).  After Stephens asked whether Evans would consent to a breathalyzer, Evans said he wanted to call his lawyer.  Stephens then placed him under arrest and repeated the request.  Evans again said that he wanted to talk to his attorney.  Stephens charged Evans with D.U.I. refusal and speeding and then placed him in the patrol car.  At Stephens's deposition, he said that Evans had alcohol on his breath, bloodshot eyes, and an unstable demeanor.  Officer

_____

[1]Evans later plead guilty to reckless driving and does not challenge that plea on appeal.

[2]By this time, Stephens was joined by an officer from the Pike County Sheriff's Office.

Stephens concluded the facts authorized the arrest of Evans.

At the scene of the stop, Officer Stephens, by radio, requested a search on Jordan's name to check for outstanding warrants. The dispatcher relayed to Stephens that a "Detre Jordan" with Plaintiff-Appellant Jordan's date of birth had an outstanding arrest warrant. Stephens then arrested Jordan.[3] After placing Jordan under arrest, Stephens searched Jordan's pockets; and Stephens said that he would release Jordan if the warrant was for someone else. While waiting on the tow truck, Stephens and another officer searched the car and surrounding area for approximately seven minutes. This search of the car was the second one that revealed, according to Plaintiffs, nothing.

Officer Stephens then drove Plaintiffs to the Pike County jail. Plaintiffs say that on the way to the jail, Jordan continued to explain the warrant was not for him and to request a phone call. Both men also recall Stephens saying that he is the judge and jury in Zebulon and that he decides who can make phone calls. Evans also recalls Stephens saying that he would "send you niggers away for a long time."

According to Plaintiffs, Officer Stephens patted them down again before they entered the county jail building. Stephens informed the jailer on duty, Officer Andre Dawson, of the charges against Plaintiffs. Dawson recalls reviewing the report on the "Jordan" in the warrant and concluding that it was not the Plaintiff; Dawson encouraged Stephens to release Jordan.

---

[3]Stephens did not know what offense had led to the outstanding arrest warrant. The parties agree that the Detre Jordan in the warrant was not Plaintiff-Appellee Jordan.

4

Officer Stephens became angry and walked Jordan to a room that appeared to be a supply closet or mop storage room. There, Stephens pestered Jordan with racist language and ordered Jordan to place his hands on the wall and to remove his shoes and shirt. Jordan complied. Stephens then ordered Jordan to take off his remaining clothes. When asked to lower his underwear, Jordan protested by turning around and saying that Stephens had the wrong person. Jordan says that Stephens then put him in a choke hold and held him against the wall until Jordan began to gag.[4] Jordan faced the wall again; and then Evans was thrown into the room, hitting Jordan and causing both men to fall. As Jordan tried to stand, Stephens hit Jordan's side with a baton-like "cold black" object.[5]

Evans says that, once he was in the room and standing against the wall, Stephens again ordered Jordan to take off his underwear. According to Jordan, after Officer Stephens—in Evans's presence—pulled Jordan's underwear to his ankles, Stephens used the same "cold black" object to separate Jordan's butt cheeks and "stuck me in my anus."

After searching Jordan, Stephens turned to Evans. Evans says Stephens told him to remove his underwear and then—in Jordan's presence—placed "the [same] stick in my ass." According to Evans, Stephens also used the baton to lift Evans's and Jordan's testicles. Evans testified at his deposition that Stephens used the same baton

---

[4]According to Evans, the chokehold occurred after Evans was in the room and after Jordan described the order to take off his underwear as "some bullshit and I ain't going to pull my drawers."

[5]Plaintiffs describe the baton-like object as a cold, black cylindrical, object. We use the term "baton-like object" or "baton" to describe whatever Officer Stephens allegedly used to hit and probe Plaintiffs.

5

on both Plaintiffs and that Stephens did not clean or wipe down the baton during the strip search.

While conducting the strip search, Stephens taunted both Plaintiffs with laughter, racist language and threats of prison—where Stephens promised to send Plaintiffs. After the strip search, Evans and Jordan were made to dress quickly. Plaintiffs were then handcuffed to the bench in front of the jailer; they then spent the night in the general jail population.[6]

Officer Stephens said he had a reasonable suspicion that Plaintiffs had drugs based on their demeanor (nervousness at the roadside stop) and their story of being lost. This suspicion, Stephens claims, justified the strip search for drugs.

Plaintiffs brought suit in the United States District Court for the Northern District of Georgia, claiming in part, that Stephens violated their rights to the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, as well as Title VII of the 1965 Civil Rights Act. In the light of Defendants' motions for summary judgment, the claims were narrowed to ones based on the Fourth Amendment. The district court decided, if Plaintiffs' story was true, that the strip search violated Evan's and Jordan's constitutional rights and that Stephens was entitled to no immunity. A panel of this Court agreed that the Constitution was violated, because (1) Stephens lacked reasonable suspicion to perform the strip search; and (2) the manner in which he conducted the strip search was unreasonable. *Evans v. City of Zebulon,* 351 F.3d

---

[6]Officer Stephens tells a completely different story: he did not perform a pat down search outside the jail; he did not place Evans and Jordan in a supply closet, but a trustee cell. He recalls asking Evans and Jordan to take off their clothing, but not touching or taunting them. Officer Stephens also says that neither Plaintiff resisted the strip search.

6

485, 497 (11th Cir.2003), *vacated by Evans v. City of Zebulon,* 364 F.3d 1298 (11th Cir.2004). The panel also concluded that qualified immunity applied to Officer Stephens for both violations. *Id.*

## STANDARD OF REVIEW

We review denials of summary judgment de novo. *Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1247 (11th Cir.2004). We do not make credibility determinations, but instead believe the "evidence of the non-movant ... and all justifiable inferences are to be drawn in his favor." *Stewart v. Booker T. Washington Ins.,* 232 F.3d 844, 848 (11th Cir.2000) (citations omitted).

As we said in *Draper v. Reynolds,* 369 F.3d 1270, 1272 (11th Cir.2004), and *Rowe v. Ft. Lauderdale,* 279 F.3d 1271, 1279 n. 9 (11th Cir.2002), we accept the nonmovant's version of the events when reviewing a decision on summary judgment. When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.[7] Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version.* Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole

---

[7]Plaintiffs' counsel urge us to accept a mixed description of events. Plaintiffs specifically argue that we should credit Officer Stephens's statement that Jordan in no way resisted or protested the strip search, but that we should also believe Plaintiffs' depiction of the manner of the search, including the choke hold. For summary judgment, we believe the evidence of the nonmovant (at least when, as here, the nonmovant's testimony is not doubtlessly incredible and the movant seems competent to give testimony).

or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*DISCUSSION*

We mainly must decide two issues. Whether the strip searches performed on Plaintiffs violated their rights under the United States Constitution and, if so, whether that right—given the circumstances facing Officer Stephens—was already so clearly established that every objectively reasonable officer would have known that Defendant was violating federal law at the time. We conclude that the strip search here violated two rights of Plaintiffs, both arising under the Fourth Amendment. First, the strip searches—as a post-arrest criminal investigation—were unreasonable, because they were not supported by a reasonable suspicion of the existence of drug evidence. Second, even if some strip search might have been lawful, the manner in which these strip searches were performed was also unreasonable as a matter of federal law. In addition, we conclude that the right to be free altogether of a strip search was, under the circumstances, not already clearly established at the time of the incident, but that the Fourth Amendment itself provided, at the time, sufficient notice that the manner of these particular searches was "unreasonable" in the constitutional sense.

1.    *The Constitutional Violations.*

The panel opinion in this case included these words: "Arrestees who are to be detained in the general jail population can constitutionally be subjected to a strip search only if the search is supported by reasonable suspicion that such a search will

8

reveal weapons or contraband." *Evans v. City of Zebulon,* 351 F.3d 485, 490 (11th Cir.2003) *vacated by Evans v. City of Zebulon,* 364 F.3d 1298 (11th Cir.2004). And these words doubtlessly contributed to causing some judges to vote for en banc rehearing.

Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching—for security and safety purposes—arrestees bound for the general jail population. For background, see *Cuesta v. Sch. Bd. of Miami-Dade County,* 285 F.3d 962, 969 n. 6 (11th Cir.2002) (strip search policy at jail); *Wilson v. Jones,* 251 F.3d 1340, 1343 (11th Cir.2001) (same); *Skurstenis v. Jones,* 236 F.3d 678, 682 (11th Cir.2000) (same) (solitary confinement). Never has the Supreme Court imposed such a requirement. *See Bell v. Wolfish,* 441 U.S. 520, 559-60, 99 S.Ct. 1861, 1884-85, 60 L.Ed.2d 447 (1979) (rejecting claim that strip search policy at a federal jail for mostly pretrial detainees violated the Fourth Amendment per se); *United States v. Edwards,* 415 U.S. 800, 808 n. 9, 94 S.Ct. 1234, 1239 n. 9, 39 L.Ed.2d 771 (1974) (reserving whether "custodial searches incident to incarceration" might violate the Constitution in either "number or ... manner of perpetration").

But, on reflection, this case provides no opportunity to decide the question of when jailers—for security and safety purposes—may lawfully conduct strip searches of persons about to become inmates in the general jail population. This case raises no questions about the necessities of jail administration. *Cf. Bell,* 441 U.S. at 559-61, 99 S.Ct. at 1884-86. This case involves a different kind of search altogether: a

post-arrest investigatory strip search by the police looking for evidence (and not weapons). Officer Stephens—who was not a jailer—testified (without contradiction from others) that he strip-searched Plaintiffs because he (as the arresting officer) believed them to be in possession of illegal drugs: the search was part of a criminal investigation looking for evidence.

Never has the Supreme Court explicitly addressed the standard applied to determine if a post-arrest investigatory strip search (away from the complicated context of the nation's borders) violates the Fourth Amendment. Several cases provide guidance, including *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *Bell,* 441 U.S. at 520, 99 S.Ct. at 1861; *Edwards,* 415 U.S. at 800, 94 S.Ct. at 1234; *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).

*Bell,* 441 U.S. at 560, 99 S.Ct. at 1885, 60 L.Ed.2d 447, does involve strip searches. *Bell* concluded that such searches, of inmates in a jail for security purposes, were permissible without probable cause; but it does not address what standard is necessary for investigative searches outside *Bell*'s jail security context.

When we balance the need for investigative strip searches for evidence that might be hidden on the arrestee's body against the intrusiveness inherent in a strip search, we believe *Buie,* 494 U.S. at 325, 110 S.Ct. at 1093, provides the analytical framework that, *at a minimum,* would apply to strip searches for evidence. There, the Court addressed a post-arrest protective sweep search of the arrestee's house. The

Court relied, in part, on *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (addressing pat down searches of persons). *Id.,* 494 U.S. at 331, 110 S.Ct. at 1097. *Buie* concluded that searches of property incident to arrest must be justified by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing" the search was necessary. 494 U.S. at 334, 110 S.Ct. at 1098. Put differently, we are confident that an officer must have at least a reasonable suspicion that the strip search is necessary for evidentiary reasons.[8] Perhaps the actual standard is higher than reasonable suspicion, especially where, as here, the search includes touching genitalia and penetrating anuses. But because Officer Stephens—in the light of the supposed facts—did not meet even the minimum possible standard of reasonable suspicion, we need not decide if the actual standard is something even higher to decide whether Officer Stephens failed to comply with the Constitution.[9]

Whether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable police officer at the scene. *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-62, 134 L.Ed.2d 911 (1996). It is based on the totality of the circumstances, *Garrett v. Athens-Clarke County,* 378 F.3d

---

[8]We stress that we are not deciding that this standard applies to strip searches for other purposes, such as, searches conducted by jailers on arrestees bound for a jail's general population as part of a safety or security routine of the jail. In this case, we are also not dealing with a search for weapons that might pose a threat to the safety of law officers or others.

[9]By the way, we note that Officer Stephens testified that he believed the legal standard needed for the search was that of reasonable suspicion. Of course, Officer Stephens's subjective intentions and beliefs in conducting the strip search are immaterial to the Fourth Amendment analysis. *See Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Ulterior motives will not make an otherwise lawful search unlawful.

11

1274, 1279 (11th Cir.2004), and is a question of law to be reviewed de novo. *Ornelas,* 517 U.S. at 696-97, 116 S.Ct. at 1662.

Officer Stephens contends that Plaintiffs' nervousness, their story about being lost, and their traveling in a rental car established reasonable suspicion of drugs capable of justifying the search. After the events underlying this case had occurred, we rejected an analogous argument in *United States v. Boyce,* 351 F.3d 1102, 1109 (11th Cir.2003), when the government attempted to use similar facts to provide law enforcement officers with a reasonable suspicion for a prolonged traffic stop to search for drugs. In the case now before us, Plaintiffs were arrested not for drugs, but for DUI refusal and an outstanding arrest warrant (for an unspecified offense). Nevertheless, even if the adjuncts of this stop and arrest might have initially supported a reasonable suspicion of drugs, the strength of that suspicion was undermined by other events before the strip search got started.

Officer Stephens searched Plaintiffs' car for over ten minutes, and taking the facts most favorable to Plaintiffs, he found nothing about drugs. In addition, Stephens searched the area surrounding the car and found nothing about drugs. Furthermore, Plaintiffs testified that Stephens had checked their pockets and twice patted down each of them before he strip-searched them in the jail. These searches also revealed nothing. This lack of revealed evidence undermines the reasonableness of Officer Stephens's belief that Plaintiffs possessed drugs. *See Brent v. Ashley,* 247 F.3d 1294, 1302 (11th Cir.2001) (addressing strip search by customs agents). Moreover, Stephens did not observe Plaintiffs attempting to hide anything on their

person. *See Kraushaar v. Flanigan,* 45 F.3d 1040, 1046 (7th Cir.1995) (addressing strip search at jail). Thus, we decide, bearing all the circumstances in mind, that Officer Stephens violated Plaintiffs' right to be free from an unreasonable search when he performed an investigatory strip search for drugs: he was without the necessary reasonable suspicion that Plaintiffs (arrested on other charges) had drugs—the asserted ground for the searches—on their person.[10]

We also conclude the manner in which Officer Stephens conducted the strip search violated Plaintiffs' constitutional rights. Though not directly applicable to this case, *Bell* acknowledged that even correctional officers in a jail cannot properly conduct strip searches of incarcerated inmates in "an abusive fashion." 441 U.S. at 560, 99 S.Ct. at 1885 (internal citations omitted). Abuse cannot be condoned. While searches need not be delicately conducted in the least intrusive manner, they must be conducted in a reasonable manner.

Viewing the facts in their totality and taking the facts most favorable to Plaintiffs' version, we conclude that Stephens conducted these strip searches in an unconstitutional manner. Plaintiffs were taken to and searched in an abnormal place (thus, capable of exciting more fear): a broom closet or supply room, not a dedicated search cell, medical examination room, or even a bathroom. *See Justice v. Peachtree City,* 961 F.2d 188, 193 (11th Cir.1992) (approving of private room); *Skurstenis v. Jones,* 236 F.3d at 678, 682 (11th Cir.2000) (bathroom). Little respect for privacy

---

[10]Officer Stephens acknowledged that he did not suspect Plaintiffs had weapons in their possession. This view was the objectively reasonable one. At his deposition, Stephens agreed that whatever reasonable suspicion he had, it was for drugs and "never for weapons."

was observed. Each Plaintiff was forced to disrobe, ridiculed, and penetrated by an object in front of the other. *See Justice,* 961 F.2d at 193 (noting that arrestee and officers were the only people in room).

The physical aspects of the searches are also disturbing. Unnecessary force was used. Evans was thrown into Jordan, causing both men to collapse. As Jordan tried to stand back up, Officer Stephens hit him with a baton-like object. It matters that a body cavity search was undertaken. In addition, while conducting the search, Stephens inserted the same baton or club—without intervening sanitation—in each Plaintiffs' anus and used the same baton or club to lift each man's testicles.[11] Apart from other issues, this last practice is highly unsanitary. *See Bonitz v. Fair,* 804 F.2d 164, 173 (1st Cir.1986) (acknowledging non-hygienic manner of search) *overruled on other grounds by Unwin v. Campbell,* 863 F.2d 124, 128 (1st Cir.1998), *overruled by Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).

In considering the totality of the circumstances, we also consider Officer Stephens's language. *Brown v. City of Hialeah,* 30 F.3d 1433, 1436 (11th Cir.1994). *See also Bell,* 441 U.S. at 560, 99 S.Ct. at 1885 (citing *Levi,* 439 F.Supp. at 147). From the time Plaintiffs were secured in the patrol car until the end of the search, Stephens used threatening and racist language.[12] We accept that such language has

---

[11]Today, we do not say that body cavity searches that penetrate orifices are per se unconstitutional. *See, e.g., Isby v. Duckworth,* 175 F.3d 1020 (7th Cir.1999) (unpublished).

[12]In the patrol car, Officer Stephens said that he was "judge and jury" in Zebulon and that he would decide whether Plaintiffs could make a phone call from the jail. He also told Plaintiffs that he would "send you niggers away for a long time." Once in the room where the strip search occurred, Stephens called Evans a smart aleck and a smart ass. He told Jordan that he didn't like "you boys in my town. I don't want niggers here anyway." Stephens told another officer allegedly in the room that Evans and Jordan made "my jail cell smell[ ] like [Plaintiffs]," and that he would send Plaintiffs to prison for the

14

an impact on people and counts towards the unreasonableness of the manner of the searches.

We do not imply that words alone can make the manner of an otherwise properly conducted search unconstitutional under the Fourth Amendment. But in this case, the totality of the circumstances—for example, the physical force, anal penetration, unsanitariness of the process, terrifying language, and lack of privacy—collectively establish a constitutional violation, especially when the search was being made in the absence of exigent circumstances requiring the kind of immediate action that might make otherwise questionable police conduct, at least arguably, reasonable.

2.    *Qualified Immunity*

Qualified immunity is an affirmative defense available to public officers acting within the scope of their discretionary authority. *Harbert Int'l Inc. v. James,* 157 F.3d 1271, 1281 (11th Cir.1998).[13]  It shields public officers from liability so long as the transgressed right, given the circumstances, was not already clearly established, "that is 'whether it would be clear to a reasonable officer that his conduct was unlawful in

rest of their lives.  While he penetrated Plaintiffs' anuses with the baton, he said that Plaintiffs had "better get used to this, this is how it is in the big house, this is where you [sic] getting ready to go.  Somebody is going to be butt fucking you for the next twenty years, all because you got a smart mouth."

We understand that law officers sometimes use harsh words as a kind of verbal "shock and awe" tactic to deter arrestees from causing trouble that might cause violent injury to the officer or someone else.  We do not say this kind of practice is inherently unlawful or commonly will help to cause accompanying searches or seizures to be unlawful.  In this case, Plaintiffs contend they were under police control and in custody and posed no threat to Officer Stephens who, at the time of the search, was at a jail and in the company of another officer.

[13]Plaintiffs argue that Stephens acted outside his authority when he strip searched Plaintiffs, because the police chief verbally prohibited Stephens from performing strip searches.  We disagree.  Chief Lummis's instruction was limited to roadside strip searches and did not address other strip searches.

the situation he confronted.' " *Groh v. Ramirez,* 540 U.S. 551, 563, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004) (quoting *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)). The applicable law is clearly established if the " 'preexisting law dictates, that is, truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances." *Marsh v. Butler County,* 268 F.3d 1014, 1031 (11th Cir.2001) (en banc) (citation omitted). In rare circumstances, a "right may be so clear from the text of the Constitution or federal statute that no prior decision is necessary to give clear notice of it to an official." *Rowe v. Ft. Lauderdale,* 279 F.3d 1271, 1280 n. 10 (11th Cir.2002) (citation omitted). In such circumstances, the violation is obvious.

A post-arrest investigatory strip search did not obviously violate the Fourth Amendment on its face in 1999. In addition, in 1999, no applicable cases provided a police officer with fair notice that he must have, at least, a reasonable suspicion to conduct a post-arrest investigatory strip search of an adult and with fair notice that the facts before Officer Stephens were insufficient to make his suspicion reasonable for the search.[14] The law was not settled for what standard applied to post-arrest investigatory strip searches, and Supreme Court precedent was very deferential to post-arrest investigations. *See, e.g., United States v. Edwards,* 415 U.S. 800, 807-09, 94 S.Ct. 1234, 1239-40, 39 L.Ed.2d 771 (1974); *Gustafson v. Florida,* 414 U.S. 260,

---

[14]When case law is needed, only cases from the Supreme Court, our Circuit or the highest court of the pertinent state clearly establish the law in the Circuit for qualified immunity analysis. *Marsh,* 268 F.3d at 1033 n. 10.

16

265-66, 94 S.Ct. 488, 491-92, 38 L.Ed.2d 456 (1973); *United States v. Robinson,* 414 U.S. 218, 235-36, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). *Justice v. Peachtree City,* 961 F.2d 188, 192-93 (11th Cir.1992), could not squarely govern this case: it addressed a strip search of a juvenile arrested for minor offenses (loitering and truancy), and it acknowledged that unique concerns arise with strip searching youngsters. *See generally, Brosseau v. Haugen,* --- U.S. ----, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). And *United States v. Boyce,* 351 F.3d 1102, 1109 (11th Cir.2003), was decided four years after the incident in question. So, Officer Stephens is protected by qualified immunity insofar as the claim is one for conducting a strip search at all.

Qualified immunity, however, does not shield Stephens from Plaintiffs' separate claim that the manner of the strip search violated their rights under the Fourth Amendment. No preexisting case law established this violation or made it obviously clear. *Justice* and *Bell* were the only applicable cases to address strip searches, and they could not squarely govern this case. Both were materially different from this case, and both upheld strip searches.

But the text of the Fourth Amendment prohibits "unreasonable" searches. Seldom does a general standard such as "to act reasonably" put officers on notice that certain conduct will violate federal law given the precise circumstances before them: Fourth Amendment law is intensely fact specific. But we conclude the supposed facts of this case take the manner of the searches well beyond the "hazy border" that sometimes separates lawful conduct from unlawful conduct. *See generally, Priester*

17

*v. City of Riviera Beach,* 208 F.3d 919, 926 (11th Cir.2000). The violation was obvious.

Every objectively reasonable officer would have known that, when conducting a strip search, it is unreasonable to do so in the manner demonstrated by the sum of the facts alleged by Plaintiffs. The totality of the facts alleged here made this violation—on the day of the search—clear from the terms of the Constitution itself: No objectively reasonable policeman could have believed that the degrading and forceful manner of this strip search (especially in the light of the complete lack of circumstances that might have called for immediate action to conduct a search without the time for cool and calm thought about how to proceed) was "reasonable" in the constitutional sense. Accordingly, the decision of the district court is affirmed in part, reversed in part, and remanded.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

CARNES, Circuit Judge, concurring specially, in which DUBINA and HULL, Circuit Judges, join:

I concur in all of the Court's opinion but write separately for two reasons. One is to explicate a holding of the Court, and the other is to offer my views on an issue that was briefed and argued but which the Court does not reach.

**I.**

In his deposition one of the plaintiffs, Peter Evans, made a number of statements that supported his claims but one statement that was not favorable to his own case. Another witness offered testimony on that specific point that was more favorable to the plaintiffs. The Court correctly holds that for summary judgment

purposes we accept a non-movant's own testimony warts and all, instead of snipping from that testimony the parts that are less favorable than what some other witness says. There is good reason that, as the Court aptly puts it, "[o]ur duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided." *Ante* at 2217.

The good reason is that, absent some extraordinary circumstance, no reasonable jury would believe that a party was lying when he said something harmful to his own case. Reasonable juries know that is not how human nature, influenced by self-interest, works. And when we decide whether summary judgment is warranted, we view the evidence in the non-movant's favor, but only to the extent that it would be reasonable for a jury to resolve the factual issues that way. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (to defeat summary judgment "there must be evidence on which the jury could reasonably find for the plaintiff"); *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1282 (11th Cir.1999) ("[T]here must be sufficient evidence on which the jury could reasonably find for the plaintiff ...."); *id.* ("The nonmovant need not be given the benefit of every inference but only of every reasonable inference." (language from the district court's order, attached as Appendix A and adopted by the Court)); *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n. 12 (11th Cir.1988) ("The summary judgment standard requires that we resolve all reasonable doubts in favor of the

19

non-moving party, but it does not require us to resolve *all* doubts in such a manner." (quotation and ellipsis omitted)).

## II.

One of the issues we had the parties brief and orally argue is: "Whether arrestees who are to be detained in the general jail population can constitutionally be subjected to a strip search *only if* the search is supported by reasonable suspicion that such a search will reveal weapons or contraband." We also received a number of amicus briefs on that issue, some of which were helpful. The opinion for the Court notes that: "Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching—for security and safety purposes—arrestees bound for the general jail population." *Ante* at 2218. Nonetheless, the Court properly determines that this is not the case in which to decide that issue. It is not, because the strip searches in this case were undertaken by law enforcement officers looking for evidence of a crime that had been committed, instead of by the officials at the county jail acting for general security reasons.

Even though the issue cannot be decided in this case, I offer my present views on it for whatever they may be worth. This expression comes with the realization that "dicta in our opinions is not binding on anyone for any purpose," but also with the hope that this will be one of those occasions in which dicta serves a useful purpose. *See McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1314-15 (11th Cir.1998) (Carnes, J., concurring specially).

## A.

20

My present view is that reasonable suspicion is not necessary for a strip search of an arrestee who is to be detained in the general jail population, if that search is conducted pursuant to a generally applicable, reasonable jail policy designed to promote safety and security by guarding against the smuggling of weapons and other contraband into a detention facility. This view is contrary to the current circuit law on the subject, at least insofar as misdemeanor arrestees are concerned. In *Wilson v. Jones,* 251 F.3d 1340 (11th Cir.2001), involving the strip search of a misdemeanor arrestee, a panel of this Court held that the county's strip search policy violated the Fourth Amendment because it did not require reasonable suspicion. *Id.* at 1342-43; *see also Skurstenis v. Jones,* 236 F.3d 678, 682 (11th Cir.2000) (upholding a strip search of a misdemeanor arrestee because there was reasonable suspicion, but stating in dicta that a policy of strip searching all detainees in the absence of reasonable suspicion does not comport with the Fourth Amendment's requirements).

Our circuit law is the same as that of every other circuit to address the issue insofar as those detained on non-felony charges are concerned. Each of the other circuits to speak on the matter has concluded that a person arrested on a misdemeanor charge may not be strip searched upon being placed in the general jail population unless there is reasonable suspicion to believe that he is concealing a weapon or other contraband. *Masters v. Crouch,* 872 F.2d 1248, 1255 (6th Cir.1989); *Watt v. City of Richardson Police Dep't,* 849 F.2d 195, 198-99 (5th Cir.1988); *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986); *Giles v. Ackerman,* 746 F.2d 614, 615 (9th Cir.1984), *overruled on other grounds by Hodgers-Durgin v. de la Vina,* 199 F.3d 1037 (9th

21

Cir.1999); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983); *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981). A strong argument can be made that all of those decisions, and our own decision in *Wilson,* are wrong.[1]

The problem is that all of these decisions seem to read *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as imposing a requirement of reasonable suspicion for detention facility strip searches. As a majority of the present en banc Court notes, albeit in dicta, neither *Bell* nor any other Supreme Court decision imposes such a requirement. *Ante* at 2218 ("Never has the Supreme Court imposed such a requirement."). So, all of the decisions that require reasonable suspicion seem to be based on a false premise.

In misinterpreting the *Bell* decision, we and other courts have focused on a single sentence of the opinion in that case to the exclusion of virtually everything else it says. In that one sentence the Supreme Court said: "But we deal here with the question whether visual body-cavity inspections as contemplated by the [facility's]

---

[1]Some of the other circuits, at least, recognize that reasonable suspicion is not required where the arrestee being detained is charged with a felony or a violent crime. *See, e.g., Masters,* 872 F.2d at 1255 (distinguishing *Dufrin v. Spreen,* 712 F.2d 1084 (6th Cir.1983), where the court upheld a strip search policy for a pretrial detainee charged with a felony without reasonable suspicion or probable cause, from this case where the § 1983 plaintiff was arrested on a warrant for failure to appear in court); *Mary Beth G.,* 723 F.2d at 1272 (distinguishing the constitutionality of strip searches where there is no probable cause or reasonable suspicion for pretrial detainees held on "inherently dangerous" crimes from unconstitutionality of strip searches of "minor offenders").

Part of this Court's opinion in *Wilson,* by contrast, might be read to apply to those charged with felonies as well as those charged with only misdemeanors, *see Wilson,* 251 F.3d at 1342-43, although that probably would be dicta since the facts of the case did not present the issue as it applies to felony-charged detainees, *see Watts v. BellSouth Telecomm., Inc.,* 316 F.3d 1203, 1207 (11th Cir.2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); *United States v. Aguillard,* 217 F.3d 1319, 1321 (11th Cir.2000) (per curiam) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the court in the case which produced that decision." (citations and internal marks omitted)).

rules can ever be conducted on less than probable cause." *Bell,* 441 U.S. at 560, 99 S.Ct. at 1885 (emphasis omitted). The Court answered "yes," but neither the question nor the answer compels the conclusion that "less than probable cause" means "reasonable suspicion." The absence of reasonable suspicion is also "less than probable cause."

The Supreme Court simply did not say in *Bell* that before a visual body-cavity inspection can be performed on an arrestee who is being put into a detention facility there must be reasonable suspicion to believe that detainee is carrying a weapon or other contraband. To infer that requirement from one sentence of the *Bell* opinion puts more weight on the sentence than it will bear. It also ignores the rest of the majority's opinion as well as the interpretation of that opinion put forward by Justice Powell in his dissenting opinion, *id.* at 563, 99 S.Ct. at 1886, an interpretation which went unchallenged by the majority.

*Bell* involved a class action suit brought by pretrial detainees being held at the federal Metropolitan Correctional Center in New York City. The MCC required all inmates, including pretrial detainees, "convicted inmates who are awaiting sentencing or transportation to federal prison," "convicted prisoners who have been lodged at the facility under writs of habeas corpus ... issued to ensure their presence at upcoming trials, witnesses in protective custody, and persons incarcerated for contempt," *id.* at 524, 99 S.Ct. at 1866, "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit

with a person from outside the institution," *id.* at 558, 99 S.Ct. at 1884.[2]

The pretrial detainees alleged in their complaint that the MCC's strip search policy violated their Fourth Amendment right to be free from unreasonable searches.[3] The district court agreed, and enjoined MCC from conducting the searches absent individualized probable cause to believe that the detainee was concealing a weapon or other contraband. *Id.* The Second Circuit affirmed. *Id.* The question the Supreme Court had before it was this: "whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause." *Id.* at 560, 99 S.Ct. at 1885. The Supreme Court answered "yes," after "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Id.; see also id.* at 559, 99 S.Ct. at 1884.

In striking that balance, the Court weighed "the privacy interests of the inmates," *id.* at 560, 99 S.Ct. at 1885—"the scope of the particular intrusion, the manner in which it is conducted, ... and the place in which it is conducted," *id.* at 559, 99 S.Ct. at 1884—against "the significant and legitimate security interests of the institution," *id.* at 560, 99 S.Ct. at 1885. In the end, the *Bell* Court concluded that those security interests of the detention facility outweighed the privacy interests of the pretrial detainees. *Id.*

---

[2]The Supreme Court described the MCC strip search as follows: "If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected. The inmate is not touched by security personal [sic] at any time during the *visual* search procedure." *Id.* at 558 n. 39, 99 S.Ct. at 1884 n. 39.

[3]None of the decisions in this area, including our own, seem to distinguish between strip searches in general and "visual body-cavity inspections" as the procedure was described in *Bell.* I don't either.

While the Court did "not underestimate the degree to which these searches may invade the personal privacy of inmates" or ignore the fact "that on occasion a security guard may conduct the search in an abusive fashion," *id.,* there was a far more compelling interest on the other side of the scale. As the Court explained: "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id.* at 559, 99 S.Ct. at 1884. The Court deemed that a weighty consideration even though the record indicated only one instance in three years "where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person." *Id.* at 559, 99 S.Ct. at 1885. The Court believed that fact "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." *Id.*

The Supreme Court in *Bell* took a categorical approach, deciding whether the detention facility's strip search policy generally was reasonable under the Fourth Amendment, not whether it was reasonable in an individual case. *See id.* at 560, 99 S.Ct. at 1885; *see also Hudson v. Palmer,* 468 U.S. 517, 538, 104 S.Ct. 3194, 3206, 82 L.Ed.2d 393 (1984) (O'Connor, J., concurring) (citing *Bell* for the proposition that "[i]n some contexts, ... the Court has rejected the case-by-case approach to the 'reasonableness' inquiry in favor of an approach that determines the reasonableness of contested practices in a categorical fashion").

The most overlooked part of the *Bell* decision is Justice Powell's dissent. He

25

dissented for one and only one reason, which is that the majority did *not* require reasonable suspicion for conducting the strip searches in that case. His concise dissenting opinion states in its entirety:

> I join the opinion of the Court except the discussion and holding with respect to body-cavity searches. In view of the serious intrusion on one's privacy occasioned by such a search, I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case. I therefore dissent on this issue.

*Bell,* 441 U.S. at 563, 99 S.Ct. at 1886 (Powell, J., concurring in part and dissenting in part). The "searches described in this case" are the strip searches performed on all MCC pretrial detainees, not just those charged with felonies. The detainees who were searched included those charged with misdemeanors or violations, and even those charged with no wrong doing at all but who were being held as witnesses in protective custody. *See id.* at 524, 99 S.Ct. at 1866.

Justice Powell's dissenting opinion is evidence that we and other circuits have misread the *Bell* majority opinion as requiring reasonable suspicion before detainees can be strip searched. If the *Bell* majority had held what we and other circuits say it did, there would have been no dissenting opinion from Justice Powell. Granted, it can be risky to place too much reliance on dissenting opinions because they sometimes follow a Chicken Little or doomsday approach, exaggerating the nature and extent of the majority opinion in order to assail it. Justice Powell's dissent in *Bell* cannot reasonably be viewed as that type of dissent, however, because its only disagreement with the majority is about the one specific point it raises. If the majority had not permitted strip searches of pretrial detainees without reasonable suspicion,

Justice Powell would not have dissented at all.

The point is that, from his perspective inside the Court, Justice Powell had a better sense of the majority's holding in *Bell* than any circuit court of appeals could, and he understood the holding to permit strip searches without reasonable suspicion. Not only that, but if the majority had not intended to permit strip searches of pretrial detainees without reasonable suspicion, it would have been a simple matter to note that in the opinion in answer to Justice Powell's pointed statement that the Court was allowing them.

The courts, including our own, that have read a requirement of reasonable suspicion into the *Bell* decision have misinterpreted a sentence of that opinion. They also have ignored Justice Powell's dissenting opinion and the majority's failure to deny the sole point of that dissent. Interpreting the *Bell* decision as not requiring reasonable suspicion is a fairer reading than interpreting the decision to require it.

**B.**

The panel in *Wilson* appears to have interpreted *Bell* to require reasonable suspicion, at least for strip searches involving non-felony detainees, but it seems to me that under *Bell* there is a three-step analysis for deciding whether a detention facility's policy is constitutional. The first step is to determine whether the detention facility has a strip search policy permitting such searches without reasonable suspicion. *Bell,* 441 U.S. at 558, 99 S.Ct. at 1884. Absent such a policy, the detention facility does need individualized reasonable suspicion to conduct a strip search on a detainee. *See Justice v. City of Peachtree City,* 961 F.2d 188, 193 (11th

Cir.1992).

If the detention facility does have a policy permitting strip searches without reasonable suspicion, the second step of the *Bell* analysis is to balance the institutional interests of the facility against the privacy interests of the detainee to determine whether the policy is reasonable under the Fourth Amendment. *Bell,* 441 U.S. at 560, 99 S.Ct. at 1885. The Supreme Court held in *Bell* that MCC's visual body-cavity search policy was "reasonable" under the Fourth Amendment even though there was "only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person." *Id.* at 559, 99 S.Ct. at 1885. The Court did so based on testimony from "[c]orrections officials" that "visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution." *Id.* at 558, 99 S.Ct. at 1884.

If the detention facility's security interests outweigh the privacy interests of the detainee, the third step is to determine whether the strip search was "conducted in a reasonable manner," which means in compliance with the facility's reasonable policy. *Id.* at 560, 99 S.Ct. at 1885.

## C.

Usually, it will be simple enough to determine whether the detention facility has a strip search policy (the first step), and whether the policy was followed in a particular case (the third step). Most cases will turn on the second step of the analysis. Our own *Wilson* decision did, and so did all of the decisions of other

28

circuits that have already been cited. For that reason, the second step of the analysis merits closer attention.

Detention facilities are "unique place[s] fraught with serious security dangers." *Id.* at 559, 99 S.Ct. at 1884. Many of those who are being detained have been convicted of, or charged with, committing violent felonies. Even as to the other detainees, a significant percentage have "prior felony criminal histories or gang affiliations, which might make them greater security risks than the charges pending against them indicate[ ]." *Dodge v. County of Orange,* 282 F.Supp.2d 41, 48 (S.D.N.Y.2003), *rev'd on other grounds* 103 Fed.Appx. 688 (2d Cir.2004). That is true of those arrested for misdemeanors as well as those arrested on felony charges.

The gang affiliation of inmates, in particular, is a "serious security risk." *Id.* At the county jail involved in the *Dodge* case there were at least fifty gang members being held on any given day. *Id.* Not surprisingly, "[g]ang members are often more violent, dangerous, and manipulative than other inmates, regardless of the nature of the charges against them. They are also more likely than other inmates to attempt to coerce family members or to coerce, cajole, or intimidate lesser violators into smuggling contraband into the facility." *Id.* (citations omitted).

Contraband poses the greatest security risk for officials at detention facilities. As one expert explained, "one of the primary objectives of any correctional facility must be to prevent the introduction of 'contraband' into a correctional facility due to the dangers that contraband presents in a correctional setting." *Id.* at 46 (citing the testimony of George Camp, a leading corrections facility expert and a consultant to

forty-eight states on the administration of detention facilities). "Contraband" is "anything that an inmate is not permitted to have in a correctional facility," including obvious things, like weapons, ammunition, or drugs, and "lesser" items, like money, cigarettes, or "excess prison issue items" (e.g. clothing and linens). *Id.* at 46-47. Of course, weapons and objects that can be made into weapons pose the most direct and obvious threat to security within a detention facility, and within the courthouses to which the detainees are taken for hearings or trials.

Non-weapon contraband is also bad because it "can be used by inmates to barter, and thus be held over the heads of other inmates." *Id.* at 47. Bartering "tends to disrupt prison operations by allowing certain inmates, or groups of inmates, to exercise authority in competition with correctional staff," which in turn "increase[s] the level of violence and endanger[s] the health, safety, and well-being of inmates, staff, and civilians in [the] correctional facility."[4] *Id.*

Of course, detention facility officials have a legal obligation to ensure, to the extent reasonably feasible, that their facilities are safe not only for those detained but also for those who work there and those who visit. As the Supreme Court has put it, "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), *quoted in Bell,* 441 U.S. at

---

[4]A second reason for strip searches is that it allows officials to identify gang members, who often have tattoos or identifying marks on their bodies. Finding the gang members early puts the officials on notice that these people are serious security risks and should be separated from the general population where they can cause harm. Otherwise, all the detention facility has to go on is the crime for which the individual is charged, which may not reflect the danger the person poses. *Id.* at 47-48.

546-47, 99 S.Ct. at 1878. It is for that reason the Supreme Court has held that "even when an institutional restriction infringes a specific constitutional guarantee," we must evaluate that practice in light of this central objective. *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878. "Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.*

Those who run detention facilities are convinced that strip search policies are essential to maintaining safety in their facilities. Experts agree that strip searches "are the best way to maintain the security level necessary for keeping serious and dangerous contraband out" of detention facilities. *Dodge,* 282 F.Supp.2d at 49. The Supreme Court was convinced of the same thing in *Bell,* where it concluded that, given the "serious security dangers" present in detention facilities, a policy of conducting visual body-cavity searches on all inmates after any visit with a person from the outside is a reasonable way to stop the "[s]muggling of money, drugs, weapons, and other contraband" that erode the orderly and safe administration of the facility. *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884.

Affording considerable discretion to those who have the duty to run detention facilities safely is not an abdication of the judiciary's responsibility to protect the rights of incarcerated individuals. It is instead a recognition—what the Supreme Court has called a "healthy sense of realism"—that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."

31

*Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), *quoted in Bell,* 441 U.S. at 548 n. 30, 99 S.Ct. at 1879 n. 30. To have judges second-guess detention facility officials about the need for procedures like strip searches is also in tension with the principle that "the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Bell,* 441 U.S. at 548, 99 S.Ct. at 1879.

For these reasons, a strong argument can be made that the second part of the three-prong *Bell* analysis favors permitting detention facility administrators to adopt a strip search policy that applies to all arrestees being admitted into the facility. If there is such a policy (the first prong) and if it is not applied in an abusive way (the third prong), there will be no Fourth Amendment violation.

**D.**

One other point is worth some discussion. In judging the constitutionality of strip searches for detainees, some other circuits draw a distinction between whether the person has been arrested on a felony charge or just for a misdemeanor. Our circuit law is unclear about that. *See ante* at 2224 n. 1. In any event, I think a strong argument can be made that such a distinction is without constitutional significance and finds no support in the real world of detention.

While *Masters v. Crouch,* 872 F.2d 1248 (6th Cir.1989), *Watt v. City of Richardson Police Department,* 849 F.2d 195 (5th Cir.1988), *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986), *Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *overruled on other grounds by Hodgers-Durgin v. de la Vina,* 199 F.3d 1037 (9th Cir.1999), *Mary*

32

*Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983), and *Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981), vary in detail around the edges, the picture they paint is essentially the same: The arrestee is charged with committing a misdemeanor or some lesser violation and, while being admitted to the detention facility, she is subjected to a strip search pursuant to the facility's policy. The plaintiff sues the officials asserting that the search was unconstitutional because the guards did not have any reasonable basis for believing that she was hiding contraband on her person. *See, e.g., Logan,* 660 F.2d at 1009-11. In each cited case, the court of appeals holds that because the plaintiffs were "minor offenders who were not inherently dangerous," *Mary Beth G.,* 723 F.2d at 1272, detention officials needed "reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest," *Weber,* 804 F.2d at 802. Because reasonable suspicion was lacking in each case, the search is held to violate the Fourth Amendment.

The Supreme Court made no distinction in *Bell* between detainees based on whether they had been charged with misdemeanors or felonies. Instead, the policy that the Court treated categorically, and upheld, provided that "[i]nmates at all Bureau of Prison facilities, including the MCC, are required to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." *Bell,* 441 U.S. at 558, 99 S.Ct. at 1884. Among the "[i]nmates at all Bureau of Prison facilities, including the MCC," were detainees facing only misdemeanor charges, people incarcerated for contempt of

33

court, and witnesses in protective custody who had not been accused of doing anything wrong. *See id.* at 524 & n. 3, 99 S.Ct. at 1866 & n. 3. The MCC was hardly a facility where all of the detainees were "awaiting trial on serious federal charges," as some of the opinions of other circuits seem to indicate. It is on that basis that they distinguish what they describe as the "exaggerated" need for strip searches at county facilities from the "real" need at federal facilities. *See, e.g., Mary Beth G.,* 723 F.2d at 1272.[5]

The need for strip searches at county jails is not exaggerated. Employees, visitors, and those who are themselves detained face a real threat of violence, and administrators must be concerned on a daily basis with the smuggling of contraband on the person of those accused of misdemeanors as well as those accused of felonies. *Dodge,* 282 F.Supp.2d at 46-49. Even some of the circuits that have required reasonable suspicion for searches of those arrested for misdemeanors concede that there have been instances where contraband was smuggled into a jail by detainees facing only misdemeanor or lesser charges. *See, e.g., Giles,* 746 F.2d at 617.

Then there is the fact that gang members commit misdemeanors as well as felonies. In one county jail, for example, fifty percent of those being held on "misdemeanor or lesser charges" were gang members. *Dodge,* 282 F.Supp.2d at 48

---

[5]The facility involved in the *Bell* case was not some special sort of seething cauldron of criminality. The Supreme Court described the facility this way: "MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities." *Bell,* 441 U.S. at 525, 99 S.Ct. at 1866. In the three years MCC strip searched all inmates before the trial in *Bell,* there was only *one* instance of smuggled contraband. *Id.* at 559, 99 S.Ct. at 1885. Yet, the Supreme Court found that "serious security dangers" warranted the strip search policy at all federal detention facilities, including MCC. *Id.* at 559, 99 S.Ct. at 1884-85.

(citing figures from 2002).  "Gang members are often more violent, dangerous, and manipulative than other inmates, regardless of the nature of the charges against them."  *Id.*  Not only that, but "officials at a county jail ... usually know very little about the new inmates they receive or the security risks they present at the time of their arrival." *Id.*  Moreover, some gang members "attempt to coerce family members or to coerce, cajole, or intimidate lesser violators into smuggling contraband into the facility."  *Id.*

These reasons support the expert opinion that all of those who are to be detained in the general population of a detention facility should be strip searched. *See id.* at 49.  The Supreme Court has instructed us that detention facility administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878.  It has also explained that "judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." *Id.* at 548, 99 S.Ct. at 1879 (citing *Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807).  Decisions that carve out misdemeanor arrestees for special treatment do not seem to afford those who run detention facilities the "wide-ranging deference" the Supreme Court has mandated.

**E.**

35

To summarize, the en banc Court is correct to note that the Supreme Court has never required reasonable suspicion for strip searches of arrestees bound for the general jail population. *Ante* at 2218. The contrary reading of the Supreme Court's *Bell* decision that led to the holding in *Wilson v. Jones,* 251 F.3d 1340 (11th Cir.2001), is mistaken. When we have a case that squarely presents the issue for review, we ought to take it en banc in order to reconsider our *Wilson* decision.

**F.**

Judge Barkett suggests that in the process of expressing in this opinion my views, which are critical of the position she stated in the *Wilson* case, I have violated Article III. *Post* at 2235 n.1. Her theory is that the statement of dicta in a judicial opinion "intrudes upon the constitutional restraints on the jurisdiction of the federal courts." *Id.* This novel theory apparently did not come to mind when she was writing the *Wilson* opinion broadly enough to invalidate a detention search policy in its entirety even though that case did not present the issue of whether the policy was valid as applied to those arrested on felony charges. *See Wilson,* 251 F.3d at 1342-43.

The idea that dicta is unconstitutional also must not have come to her mind when Judge Barkett was authoring the opinion of this Court in *Aron v. United States,* 291 F.3d 708 (11th Cir.2002). The facts in *Aron* were that the petitioner who sought the benefit of equitable tolling had exercised due diligence before the enactment of 28 U.S.C. § 2255(4), which is the AEDPA's statute of limitations. *Id.* at 710. Nonetheless, Judge Barkett purported to "hold" for the Court that "a petitioner's failure to exercise due diligence before AEDPA was enacted cannot support a finding

that a petition fails to satisfy the timeliness requirement." *Id.* at 713. That was classic dicta, as I pointed out in a concurring opinion in *Aron. Id.* at 716-18 (Carnes, J., concurring). It took this Court only two months to issue an opinion in another case, whose facts did present the pre-AEDPA diligence issue, recognizing that statement on the issue in *Aron* was dicta and declining for that reason to be bound by it. *Drew v. Dep't of Corrs.,* 297 F.3d 1278, 1290-92 n. 5 (11th Cir.2002).

To be fair, Judge Barkett is by no means the only member of this Court to sow dicta in her opinions. Indeed, when one looks for it, dicta appears to be scattered across the opinions of this Court like wildflowers in a spring meadow. A baker's dozen examples should suffice to prove the point: *United States v. Williams,* 340 F.3d 1231, 1234-37 (11th Cir.2003) (stating that appellate courts are obliged to apply a "due deference" standard of review to a sentencing judge's application of the sentencing guidelines to the facts in a particular case, which was recognized as dicta as it related to situations other than a challenge to the district court's grouping of a defendant's offenses in *United States v. Miranda,* 348 F.3d 1322, 1330 n. 8 (11th Cir.2003)); *United States v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir.1999) (stating that "[w]e will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if[, among other things,] ... there is clear evidence of contrary legislative intent," which was recognized as dicta in *CBS Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217, 1227 (11th Cir.2001)); *Babicz v. Sch. Bd.,* 135 F.3d 1420, 1422 n. 10 (11th Cir.1998) (per curiam) (stating that compensatory damages are not available under the Individuals with Disabilities

Education Act, which was recognized as dicta in *Ortega v. Bibb County Sch. Dist.,* 397 F.3d 1321, 1326 (11th Cir.2005)); *GJR Invs., Inc. v. County of Escambia,* 132 F.3d 1359, 1367 (11th Cir.1998) (stating that a heightened pleading standard applies to all § 1983 actions, which was recognized as dicta in *Swann v. S. Health Partners, Inc.,* 388 F.3d 834, 838 (11th Cir.2004)); *United States v. Carter,* 110 F.3d 759, 761-62 (11th Cir.1997) (per curiam) (stating that a sentencing judge must give reasons for his ruling on the applicability of the 18 U.S.C. § 3553(a) factors, which was recognized as dicta in *United States v. Eggersdorf,* 126 F.3d 1318, 1322 & n. 4 (11th Cir.1997)); *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1100 (11th Cir.1996) (stating that the pre-Civil Rights Act statutes of limitations apply to ADEA actions where the challenged conduct occurred prior to the enactment of the Civil Rights Act, which was recognized as dicta in *Browning v. AT&T Paradyne,* 120 F.3d 222, 225 n. 7 (11th Cir.1997) (per curiam)); *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1186 (11th Cir.1994) (stating that "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity," (quotation omitted) which was recognized as dicta in *Marsh v. Butler County, Ala.,* 268 F.3d 1014, 1030 n. 8 (11th Cir.2001)); *Vernon v. FDIC,* 981 F.2d 1230, 1233-34 (11th Cir.1993) (stating that the common law *D'Oench* doctrine does not operate "to bar free standing tort claims that are not related to a specific asset acquired by the FDIC," which was recognized as dicta in both *OPS Shopping Ctr., Inc. v. FDIC,* 992 F.2d 306, 310 (11th Cir.1993), and *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 597 n. 7 (11th Cir.1995)); *United States v. Harris,* 990 F.2d 594, 597 (11th Cir.1993) (stating that "it is

inappropriate to imprison or extend the term of imprisonment of a federal defendant for the purpose of providing him with rehabilitative treatment," which was recognized as dicta in *United States v. Aguillard,* 217 F.3d 1319, 1321 (11th Cir.2000) (per curiam)); *United States v. Nixon,* 918 F.2d 895, 903 n. 6 (11th Cir.1990) (stating that anticipatory search warrants are only appropriate "where the contraband is on a 'sure course' to a known destination," which was recognized as dicta in *United States v. Santa,* 236 F.3d 662, 672 n. 14 (11th Cir.2000)); *Wilkinson ex rel. Wilkinson v. Bowen,* 847 F.2d 660, 662 (11th Cir.1987) (per curiam) (stating in a Social Security case that "[i]n order to meet a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement," which was recognized as dicta in *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.,* 391 F.3d 1276, 1285 (11th Cir.2004)); *Self v. Great Lakes Dredge & Dock Co.,* 832 F.2d 1540, 1547 (11th Cir.1987) (stating a rule for contribution and settlement bar in maritime actions for personal injuries, which was recognized as dicta in *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller,* 957 F.2d 1575, 1578 (11th Cir.1992)); and *Fairley v. Patterson,* 493 F.2d 598, 603-04 (5th Cir.1974) (stating that voters in a district that was less over-represented than other districts had standing to sue, which was recognized as dicta in *Wright v. Dougherty County, Ga.,* 358 F.3d 1352, 1356 (11th Cir.2004)).

If our own opinions did not demonstrate that the use of dicta is constitutionally permissible, proof positive can be found in the fact that the ultimate arbiter of Article

III and all other constitutional provisions not infrequently sows its own opinions with dicta. There are many examples, but an even ten will do: *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 256, 113 S.Ct. 2063, 2069, 124 L.Ed.2d 161 (1993) (stating that restitution is a category of relief that is typically available in equity, which was recognized as dicta in *Great-W. Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 215, 122 S.Ct. 708, 715, 151 L.Ed.2d 635 (2002)); *United States v. James,* 478 U.S. 597, 605, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (stating that "[i]t is thus clear from [33 U.S.C.] § 702c's plain language that the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control," which was recognized as dicta and disavowed in *Cent. Green Co. v. United States,* 531 U.S. 425, 430-31, 121 S.Ct. 1005, 1008-09, 148 L.Ed.2d 919 (2001)); *Berkemer v. McCarty,* 468 U.S. 420, 439-40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (stating that, in the context of a *Terry* stop, a detainee is not obliged to respond to questions, which was recognized as dicta in *Hiibel v. Sixth Judicial Dist. Court,* 542 U.S. 177, 124 S.Ct. 2451, 2459, 159 L.Ed.2d 292 (2004)); *Michigan v. Long,* 463 U.S. 1032, 1036 n. 1, 103 S.Ct. 3469, 3473 n. 1, 77 L.Ed.2d 1201 (1983) (stating, in the context of a situation where the defendant exited his vehicle before the officers initiated contact, that the officers could have permissibly searched the defendant's vehicle had they arrested him, which was recognized as dicta in *Thornton v. United States,* 541 U.S. 615, 124 S.Ct. 2127, 2131, 158 L.Ed.2d 905 (2004)); *Bill Johnson's Rests., Inc. v. NLRB,* 461 U.S. 731, 747, 103 S.Ct. 2161, 2172, 76 L.Ed.2d 277 (1983) (stating the standard for the NLRB to use

in order to declare a completed lawsuit unlawful under the NLRA, which was recognized as dicta in *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 527, 122 S.Ct. 2390, 2397, 153 L.Ed.2d 499 (2002)); *Donovan v. Penn Shipping Co.,* 429 U.S. 648, 649, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977) (per curiam) (stating that "[t]he proper role of the trial and appellate courts in the federal system in reviewing the size of jury verdicts is ... a matter of federal law," which was recognized as dicta in *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 447 n. 6, 116 S.Ct. 2211, 2229 n. 6, 135 L.Ed.2d 659 (1996)); *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 2094-95, 40 L.Ed.2d 452 (1974) (stating in a forfeiture case that "it would be difficult to reject the constitutional claim of an owner ... who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property," which was recognized as dicta in *Bennis v. Michigan,* 516 U.S. 442, 449-50, 116 S.Ct. 994, 999, 134 L.Ed.2d 68 (1996)); *Braden v. 30th Judicial Circuit Court,* 410 U.S. 484, 495, 93 S.Ct. 1123, 1130, 35 L.Ed.2d 443 (1973) (stating that "[s]o long as the custodian can be reached by service of process, the court can issue a writ 'within its jurisdiction' ... even if the prisoner himself is confined outside the court's territorial jurisdiction," which was recognized as dicta in *Rumsfeld v. Padilla,* --- U.S. ----, 124 S.Ct. 2711, 2723, 159 L.Ed.2d 513 (2004)); *Bouie v. City of Columbia,* 378 U.S. 347, 353-54, 362, 84 S.Ct. 1697, 1702, 1707, 12 L.Ed.2d 894 (1964) (stating that "[i]f a state legislature is barred by the Ex Post Facto Clause from passing ... a law, it must follow that a State Supreme Court is barred by the Due

41

Process Clause from achieving precisely the same result by judicial construction," which was recognized as dicta in *Rogers v. Tennessee,* 532 U.S. 451, 458-59, 121 S.Ct. 1693, 1698, 149 L.Ed.2d 697 (2001)); and *Am. Fire & Cas. Co. v. Finn,* 341 U.S. 6, 16, 71 S.Ct. 534, 541, 95 L.Ed. 702 (1951) (stating that district court judgments can be upheld, despite an improper removal, where the district court would have had original jurisdiction at the time of trial or of the entry of judgment, which was recognized as "well-known dicta" in *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 71-72, 117 S.Ct. 467, 474, 136 L.Ed.2d 437 (1996)).

All of these examples show that it is too late in the judicial day for any suggestion that the use of dicta amounts to the issuance of an advisory opinion in violation of Article III's case or controversy requirement. As one commentator has correctly noted: "Essentially, an advisory opinion consists of formal, binding advice from a court of law to other government officials or the general public in the absence of a live case or controversy pending before the court. This definition would not encompass other forms of judicial advice, including dicta, alternative holdings, and the like, which are admittedly in some sense precatory in nature." Ronald J. Krotoszyniski, Jr., *Constitutional Flares: On Judges, Legislatures, and Dialogue,* 83 Minn. L. Rev. 1, 8 n.27 (Nov.1998). The self-described dicta in my concurring opinion does not purport to be "binding advice." It is merely the statement of my views at this time on an issue that was briefed and argued but is not being decided in this case. The opinion itself explicitly acknowledges that these views bind no one, including me. *Ante* at 2224.

Stated somewhat differently, even if these views are seen as "advisory" in the colloquial sense, their expression does not violate Article III. *See* Evan Tsen Lee, *Deconstitutionalizing Justiciability: The Example of Mootness,* 105 Harv. L. Rev. 603, 648-49 (Jan.1992) ("It is clear that dicta—whether or not courts deem it to constitute an 'advisory opinion'—run afoul of no constitutional or jurisdictional barrier."); *id.* at 649 ("[W]hether to engage in dicta is a matter for the considered discretion of a court, and calling it an 'advisory opinion' changes that not one whit."). There are sound reasons why dicta is not binding, but there can also be good reasons for its occasional use. *See McDonald's Corp.,* 147 F.3d at 1314-15. Whether this is a proper occasion for the use of dicta is a prudential decision for the writing judge. It is not a constitutional issue.

BARKETT, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's conclusions that both the initiation and the manner of the strip searches in this case were unconstitutional, and that qualified immunity should have been denied as to the manner of the search. However, I believe that it was unquestionably clear in 1999 that an investigatory *strip search* conducted without reasonable suspicion is unconstitutional. Thus, although it may make no practical difference here, I would deny qualified immunity as it relates to the initiation of this strip search without reasonable suspicion.

Finally, I would also note that the assertion that "most" members of the Court "are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching ... arrestees bound for the general jail population,"

43

is dicta in this case, which, as the majority concedes, "provides no opportunity to decide the question...."[1]

*Stephens Is Not Entitled to Qualified Immunity for the <u>Initiation</u> of the Strip Search*

As an initial matter, the majority's distinction between the initiation of the strip search and the manner of the search appears to have no practical effect here. The initiation of the strip search is certainly one of the factors pertaining to the overall constitutionality of the search, as is the manner of the search, but it should not be addressed separately for purposes of a qualified immunity analysis. *See Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (describing a totality-of-the-circumstances analysis which takes into account "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"). However, assuming the appropriateness of such a distinction, the law was clearly established through *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *United States v. Himmelwright,* 551 F.2d 991 (5th Cir.1977), that the initiation of a strip search without reasonable suspicion was unconstitutional. Thus, Stephens was not entitled to qualified immunity for either the initiation of the search or the manner in which it

---

[1] Article III requires that we consider only those "questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Thus, staking out a position that reasonable suspicion is not required for strip searches under circumstances not at issue in this case, as Judge Carnes does, intrudes upon the constitutional restraints on the jurisdiction of the federal courts. Even the majority's suggestion that "most" members of the court are uncertain about the reasonable suspicion requirement should occur in a factually relevant case where resolution of that question is necessary to the outcome of the dispute.

was conducted.

In *Schmerber,* the Court considered whether an arresting officer violated the Fourth Amendment by extracting an arrestee's blood without a warrant after validly arresting him for driving under the influence. *See Schmerber,* 384 U.S. at 758-59, 86 S.Ct. 1826. The Court noted that searches incident to arrest are generally valid, but explained that "the mere fact of a lawful arrest" was not conclusive in this case. *Id.* at 769, 86 S.Ct. 1826. *In particular, the policy considerations which support the validity of searches incident to arrest "have little applicability with respect to searches involving intrusions beyond the body's surface." Id.* (emphasis added). The Court explained its reasoning as follows:

> The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

*Id.* at 769-70, 86 S.Ct. 1826.

The *Schmerber* Court did proceed to find that based on the "special facts" of that case, the searching officer "might reasonably have believed that he was confronted with an emergency" because the percentage of alcohol in the arrestee's blood would have diminished before the officer could have obtained a warrant, especially because the investigation of the accident scene and the trip to the hospital had already delayed the blood test. *Id.*

Both *Schmerber* and this case concern unusually invasive investigatory body searches incident to arrest—indeed, a strip search like this represents an even more

45

invasive and degrading procedure than a blood draw—and in both cases the object of the search was ostensibly to discover evidence retained within an arrestee's body. Unlike the officers in *Schmerber,* however, Stephens cannot argue that this search was precipitated by any emergency. Nor did he have any reason to believe that the strip search would reveal relevant evidence, while the *Schmerber* officers did have reason to believe they would find alcohol in the arrestee's blood. *See id.* at 768-69, 86 S.Ct. 1826. Thus, the features of the *Schmerber* search that saved it from violating the Fourth Amendment are absent in this case.

Moreover, even in *border searches* there was a clearly established *minimum requirement* of reasonable suspicion for investigatory strip searches by 1999. In *United States v. Himmelwright,* the former Fifth Circuit held that the Fourth Amendment required reasonable suspicion before an investigatory strip search at the border, finding that "the 'reasonable suspicion' standard is flexible enough to afford the full measure of protection which the fourth amendment commands." 551 F.2d at 995. The court "hasten[ed] to add that 'reasonable suspicion' in this context includes a requirement that customs officials have cause to suspect that contraband exists in the particular place which the officials decide to search." *Id.; see also United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

If, before 1999, the Fourth Amendment imposed a reasonable suspicion requirement on *border* strip searches, where authority to search is less constrained than it is in an ordinary domestic search incident to arrest, it is unquestionable that *at least* the same degree of suspicion was required to conduct the strip searches in this

case. *Schmerber* and *Himmelwright* clearly established before 1999 that reasonable suspicion was required to conduct an investigatory strip search. Based on the facts of this case, no reasonable officer could have believed that a strip search was justified simply because the arrestees were nervous when stopped by the police and claimed to be lost.